**Sybille BASSANO, Plaintiff**

v.

**HELLMANN WORLDWIDE LOGISTICS, INC., Defendant.**

**No. CIV.A.1:02–CV–1975–J.**

United States District Court, N.D. Georgia, Atlanta Division.

Dec. 11, 2003.

David C. Ates, Miller Billips & Ates, Atlanta, GA, for Sybille Bassano, plaintiff.

Ruth W. Woodling, Eric Michael–David Zion, Rhonda Ruth Wilcox, Fisher & Phillips, Atlanta, GA, for Hellmann Worldwide Logistics, Inc., defendant.

## ORDER

CAMP, District Judge.

Pending before the Court is Defendant's Motion for Summary Judgment [# 12–1]. The motion is **GRANTED**. The case in- volves alleged employment discrimination in violation of the Age Discrimination in Employment Act and Title VII of the Civil Rights Act of 1964, as amended.

## I. Background

Sybille Bassano ("Plaintiff") worked as branch manager of Defendant's Atlanta branch from March 1994 to January 2002. (Def.'s Stmt. of Mat. Facts ¶ 1; Pl.'s Resp. to Def. Stmt. of Mat. Facts ¶ 1.)[1] Plaintiff was 54 years old when she began working for Defendant. *Id.* ¶ 2. Plaintiff's duties as branch manager included supervising all branch personnel and managing all aspects of the branch's business. (Bassano Dep. at 57.)

Defendant is a transportation and brokerage company specializing in domestic and international freight shipments. (SMF ¶ 9.) Defendant has nineteen branches in the U.S. (Doernte Dep. at 26.) In 2000, Defendant hired Robert Doernte, age 61, as Chief Executive Officer ("CEO") and Ernst Grubenmann, age 47, as Chief Operating Officer ("COO"). (SMF ¶¶ 4,6; Def.'s Mem. of Law at 2.) At all times relevant to this action, Jim Parker was Defendant's Operating Vice–President, Larry Crawley, age 55, was Defendant's Vice–President of Quality and Operational Controls, and Kevin Hussey was Defendant's Director of Customs Compliance. (Doernte Dep. at 7; SMF ¶¶ 5, 10.)

Defendant's corporate managers who preceded Doernte and Grubenmann gave Plaintiff positive, favorable performance reviews as late as 1999 or 2000. (Bassano Dep. at 191–92.) Additionally, Parker praised Plaintiff's performance in early 2001, and Defendant awarded Plaintiff a

---

1. Defendant's statements of material fact to which Plaintiff has admitted are subsequently cited as "SMF."

Quality of Station (i.e., branch) award in 1997 or 1998. *Id.* at 192.

Defendant's new corporate managers were not pleased with Plaintiff's performance as the Atlanta branch manager. Shortly after becoming COO, Grubenmann visited the Atlanta branch and perceived it as disorganized. (Grubenmann Dep. at 18.) Based on his visit and impressions of the Atlanta employees' morale, Grubenmann considered Plaintiff a "bad leader." *Id.* at 15. In early 2001, Hussey performed a random audit of the Atlanta branch and found "serious problems." (SMF ¶ 41, Bassano Dep. at 95–97.) Specifically, Hussey discovered that over half of Plaintiff's customer shipments were not timely billed, some Atlanta branch files contained incorrect tariff classifications, and some customer shipments had left Defendant's bonded warehouse without proper documentation as required by federal law. (SMF ¶ 42–44.)

In September 2001, while at Defendant's Los Angeles branch, Hussey discovered that Plaintiff had instructed the Los Angeles employees to unpack an Atlanta customer's shipment of zippers, remove all labels and references to China or Taiwan, and re-pack the zippers for shipment to Mexico. *Id.* ¶ 10. Hussey sent Plaintiff an e-mail informing her that he believed it was fraudulent and illegal to alter the country of origin information on the zippers, which were manufactured in China. (Hussey Dep. at 45–48 & Ex. 20.) Plaintiff contends that Hussey and his assistant informed Plaintiff in advance that it was legal to change the country of origin labels, and it is unclear whether Plaintiff continued to instruct the Los Angeles employees to change the labels *after* Hussey told Plaintiff they were not to be changed.

Defendant's corporate managers were also concerned over the high employee turnover rate in the Atlanta branch.

(Doernte Dep. at 17–18.) Four people worked as the branch's Import Manager in less than two years, and the branch's entire import brokerage department left between March and June 2000. (SMF ¶¶ 17–18.) Two Atlanta branch employees, Wendell Cleghorn and Sherry Gilbert, resigned and noted in writing their dissatisfaction with Plaintiff's management. *Id.* ¶¶ 21–25. Plaintiff contends that these were problem employees whom she counseled numerous times and that she would have fired Gilbert had she not resigned. (Bassano Dep. at 77–80, 88–90.) Plaintiff further contends that the Atlanta branch's high turnover rate was caused by events beyond her control. (Bassano Aff. ¶¶ 14–18.)

At Defendant's annual branch manager meeting in November 2001, Doernte met with Plaintiff and the other branch managers concerning the branches' past performance and future budget. (Doernte Dep. at 42–43.) Doernte considered Plaintiff insubordinate at the meeting. *Id.* at 45–46. Specifically, Doernte contends that he told all branch managers to begin spending half their time making sales calls, but Plaintiff refused to sell more than two days per week. *Id.* at 43–45. Plaintiff, on the other hand, contends that Doernte told the branch managers to spend two to three days per week selling and that Doernte agreed that Plaintiff would sell two days per week. (Bassano Dep. at 147–48.) Plaintiff does not dispute, however, that Doernte told her, in response to Plaintiff's "joking" that she was too tired and too old to be making sales calls, that she was not too old and that she could do it. (SMF ¶ 32; Doernte Dep. at 44–45, 52; Hussey Dep. at 76.)

In January 2002, Crawley traveled to Atlanta and offered Plaintiff a part-time sales position as a Business Development Consultant. (SMF ¶ 45; Crawley Dep. at

35.)[2] Defendant conditioned its offer on Plaintiff's signing an employment agreement in which Plaintiff would waive any employment related legal claims against Defendant. (Grubenmann Dep. at 73–75; Crawley Dep. at 34–38 & Ex. 8.) Although Crawley told Plaintiff she was not being fired, he presented her with only one alternative to the part-time sales position—a severance agreement. (SMF ¶ 45; Crawley Dep. at 33, 46 & Ex. 9; Doernte Dep. at 23.) Plaintiff later rejected Defendant's offer and ended her employment with Defendant. (SMF ¶ 48.) Defendant hired Martin Horrocks, a forty-six year old male, as its new Atlanta branch manager. (Crawley Dep. at 54; Doernte Dep. at 47; Pl.'s Resp. to Def. Stmt. of Mat. Facts, Ex. G.)

After timely filing a charge with the EEOC, Plaintiff filed this suit in July 2002, alleging intentional age discrimination in violation of the Age Discrimination in Employment Act (the "ADEA") and intentional gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"). (Compl.¶¶ 18–21.)

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) defines the standard for summary judgment: Courts should grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The district court should 're-solve all reasonable doubts about the facts in favor of the non-movant,' ... and draw 'all justifiable inferences ... in his favor ....'" *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir.1991) (en banc). The court may not weigh conflicting evidence nor make credibility determinations. *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir.1993), *reh'g denied*, 16 F.3d 1233 (1994) (en banc).

As a general rule, "[the] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

For issues upon which the moving party bears the burden of proof at trial, the moving party must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of its claim on that legal issue. It must support its motion with credible evidence that would entitle it to a judgment as a matter of law if not controverted at trial. If the moving party makes such a showing, it is entitled to summary judgment unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of fact. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993) (quoting *Four Parcels*, 941 F.2d at 1437–38).

**2.** Although Crawley communicated the offer to Plaintiff, it is unclear who made the decision to offer Plaintiff the part-time sales position and alternative severance agreement. Doernte testified that a team comprised of Grubenmann, Parker, and himself made the decision "in a very slow process over a longer span of time." (Doernte Dep. at 14.) However, the following exchange occurred later in Doernte's deposition: "Q. Who made the decision to offer a different position to Sybille? A. Mr. Larry Crawley did this." *Id.* at 18.

On the other hand, when the non-moving party bears the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim. Instead, the moving party may simply point out to the court that there is an absence of evidence to support the non-moving party's case on the issue in question. *Id.* at 1115–16. Of course, the moving party may offer evidence to affirmatively negate a material fact upon which the non-movant has the burden and which is essential to its claim. In either case, the non-moving party may not rely upon allegations or denials in the pleadings, but instead must respond with sufficient evidence to withstand judgment as a matter of law at trial. Fed.R.Civ.P. 56(e); *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir.1994) (citing *Fitzpatrick*, 2 F.3d at 1116–17).

## III. Analysis

Plaintiff has presented no direct evidence of discrimination. Thus, the Court applies the *McDonnell Douglas* burden-shifting analysis used when there is only circumstantial evidence of discrimination. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir.2000) (en banc). The *McDonnell Douglas* analysis is applicable to ADEA and Title VII claims. *Sharp v. BellSouth Adver. & Publ'g Corp.*, 232 F.Supp.2d 1369, 1375 (N.D.Ga.2002) (Carnes, J.). Under this analysis, Plaintiff must first establish a prima facie case of discrimination. *Chapman*, 229 F.3d at 1024. If Plaintiff establishes a prima facie

case, a rebuttable presumption of discrimination arises and the burden shifts to Defendant to produce evidence of a legitimate, non-discriminatory reason for the challenged employment action. *Id.* If Defendant articulates one or more such reasons, the presumption of discrimination is eliminated and Plaintiff must proffer sufficient evidence to create a genuine issue of material fact regarding whether each of Defendant's articulated reasons is a mere pretext for unlawful discrimination. *Id.* at 1024–25.

As discussed below, the Court finds that Plaintiff has established a prima facie case of discrimination and that Defendant has sufficiently articulated legitimate, non-discriminatory reasons for removing Plaintiff from her branch manager position. Because Plaintiff has failed to produce evidence sufficient to create a genuine issue of material fact as to whether each of Defendant's articulated reasons is pretextual, Defendant's motion for summary judgment is **GRANTED**.

## A. Plaintiff's Prima Facie Case

■ To establish a prima facie case of age discrimination, Plaintiff must prove that she was: (1) a member of the protected age group; (2) subjected to adverse employment action; (3) qualified to perform as the Atlanta branch manager; and (4) replaced by or otherwise lost her branch manager position to a younger individual.[3] *Id.* at 1024. Plaintiff was a member of the protected age group as she was over the age of forty at all times while

---

3. Although the Eleventh Circuit has sometimes phrased the fourth element as requiring replacement by a "substantially younger" person, the Court has held an age difference as small as three years sufficient to satisfy this element of the prima facie case. *See Carter v. DecisionOne Corp.*, 122 F.3d 997, 1003 (11th Cir.1997). *See also Damon v. Fleming Super-* *markets of Fla., Inc.*, 196 F.3d 1354, 1360 (11th Cir.1999) (citing *Carter* in finding that employee who was five years younger than plaintiff was " 'substantially younger' "). Accordingly, the "substantially younger" requirement is met in this case because Defendant replaced Plaintiff with a man fifteen years younger than Plaintiff.

employed by Defendant. *See* 29 U.S.C. § 631(a).

■ The elements of a prima facie case of gender discrimination are the same as those for age discrimination except that, as to elements number one and four, Plaintiff need only prove that she lost her branch manager position to a male. *See Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir.2000). It is undisputed that Martin Horrocks, a 46 year old male, replaced Plaintiff, a 61 year old female, as Defendant's Atlanta branch manager.

Only the second element of the prima facie case—whether Plaintiff was subjected to adverse employment action—is disputed. Defendant contends that Plaintiff cannot establish a prima facie case of age or gender discrimination because Defendant did not terminate Plaintiff's employment. (Def.'s Mem. of Law at 8–9.) However, firing an employee is not the only "adverse employment action" prohibited by the ADEA and Title VII. *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir.2001) (holding that, to prove adverse employment action under Title VII, "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment"); *Hinson*, 231 F.3d at 829 ("Transferring an employee to a job with lower pay is an adverse employment action.") (citation omitted). Indeed, an adverse action need not be an "'ultimate employment decision.'" *Isaac v. School Bd. of Miami–Dade County, Fla.*, No. 00–0890–CIV, 2002 WL 31086118, at *8 (S.D.Fla. Sept.3, 2002).

■ Defendant's offer to Plaintiff of a lower paying, part-time, non-management position constituted an adverse employment action because the terms and conditions of Plaintiff's employment would have materially changed had Plaintiff accepted the new position, and her only alternative was to end her employment with Defendant. Plaintiff's annual salary as the Atlanta branch manager was $80,000. (Crawley Dep. at 19 & Ex. 3.) Defendant offered her a fixed annual salary of $10,000 as a Business Development Consultant and estimated that she would earn an additional $40,000 in annual sales commissions. *Id.*, Ex. 8 at 6. Defendant estimated Plaintiff's total annual compensation as Business Development Consultant, including expense reimbursements and health insurance benefits, to be $53,911.08. *Id.* Furthermore, Defendant conditioned its offer on Plaintiff's acceptance of an employment agreement, which provided for an employment term of one year, renewable at both parties' option, and which provided that "[d]uring the term ... [Plaintiff] will perform [her] duties from her home and provide not more than ten (10) hours of service per week." *Id.* at 1, ¶¶ 3–4.

When Crawley offered Plaintiff the Business Development Consultant position, Plaintiff responded "'I want my branch.'" (Crawley Dep. at 45–46.) Crawley informed Plaintiff that remaining as Atlanta's branch manager was "'not an option'" and that Plaintiff's only alternative to accepting the Business Development Consultant position was to sign a severance, or separation, agreement. *Id.* at 46.[4] Thus,

---

4. Defendant argues that Plaintiff chose not to accept its offer and, thus, voluntarily resigned. It is undisputed, however, that Defendant's offer was a "take it or leave it" proposition that gave Plaintiff no option of maintaining her then current terms and conditions of employment. *See* Crawley Dep. at 39 ("Q: So am I correct that she had two options at that point? One is accept the alternative position, and as part of that, release any claims she had against Hellmann's, or separate from employment by accepting that separation agreement. Correct? A: Correct."); Doernte Dep. at 23 ("Q: Well, the

Defendant essentially decided to transfer Plaintiff to a different position. Viewed objectively, this decision constituted an adverse employment action because the terms and conditions of Plaintiff's employment as a business development consultant would have been materially different from the terms and conditions of her employment as the Atlanta branch manager. *See Hinson,* 231 F.3d at 829 ("[A] transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige or responsibility.") (citation omitted). Therefore, Plaintiff has established a prima facie case of discrimination under the ADEA and Title VII.

### B. Defendant's Non–Discriminatory Reasons

Defendant articulated the following non-discriminatory reasons for its decision to transfer Plaintiff from her branch manager position: (1) Plaintiff had a poor record regarding staff turnover at the Atlanta branch; (2) Plaintiff pressured the Los Angeles branch to change country of origin labels for the zipper shipment in violation of federal law; (3) Plaintiff was insubordinate to Defendant's corporate management; and (4) Defendant's corporate management was unimpressed with the Atlanta branch's performance. (Def.'s Mem. of Law at 12–21.)

Defendant produced evidence, in the form of deposition testimony, internal audit reports, profit and loss statements, and other documents, supporting its proffered reasons. Thus, Defendant has met its burden under the second prong of the *McDonnell Douglas* analysis and has rebutted the presumption of discrimination raised by Plaintiff's prima facie case. *See Meeks v. Computer Assocs. Int'l,* 15 F.3d

only option she had to continue working is if she accepted the other employment. Right?

1013, 1019 (11th Cir.1994) (noting that the employer's burden of production is " 'exceedingly light' ").

### C. Pretext

■ Plaintiff may establish a genuine issue of material fact as to whether Defendant intentionally discriminated against her by producing sufficient evidence that *each* of Defendant's stated reasons is a pretext for unlawful discrimination. *Chapman,* 229 F.3d at 1025 (emphasis added). However, if she "does proffer sufficient evidence that the defendant's stated reasons are pretextual, the plaintiff still may not be entitled to take h[er] case to a jury." *Id.* n. 11 (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000)). The Supreme Court has stated "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves,* 530 U.S. at 148, 120 S.Ct. at 2109.

Plaintiff has failed to establish a genuine issue of material fact as to *each* of Defendant's stated reasons for transferring her from the Atlanta branch manager position, and based on the evidence in the record, no rational juror could conclude that Defendant unlawfully discriminated against Plaintiff. *Cf. Hinson,* 231 F.3d at 830–31 (reversing grant of summary judgment to defendants on Title VII claim because plaintiff presented evidence sufficiently challenging "*every* reason the Board propounded for being dissatisfied with her") (emphasis added). Specifically, there is no genuine issue of fact as to Defendant's fourth, and arguably most le-

. . . A: Yes. That's what we offered.").

gitimate, proffered reason for its actions— Plaintiff's poor performance as the Atlanta branch manager. Plaintiff has not cited any evidence in the record suggesting that Defendant's corporate managers did not honestly believe Plaintiff was a poor branch manager. Even assuming the falsity of the corporate managers' beliefs and impressions of Plaintiff's performance as a branch manager, there is no evidence that Plaintiff's age or gender played any role in their decision to transfer her.

### i. Plaintiff's Performance as the Atlanta Branch Manager

Defendant asserts that the decision to transfer Plaintiff from her branch manager position was based in large part on Plaintiff's failure to grow the Atlanta branch. Grubenmann testified that the Atlanta "branch performance was not good. That was the reason [Plaintiff] is no longer with us. If she would have done a good job, she would be with us today." (Grubenmann Dep. at 71.) Plaintiff does not dispute Grubenmann's and Doernte's testimony, (Doernte Dep. at 38–39; Grubenmann Dep. at 71), that their primary concern regarding the Atlanta branch's performance was the branch's *operating* profit (or loss). (Pl.'s Stmt. of Mat. Facts at 12 n. 1 & ¶ 25.) (admitting that "Grubenmann finally testified that it was the economic performance of the branch that resulted in her removal as Branch Manager" and that "Doernte has testified that their stated reason for Bassano's termination 'failure to grow the Atlanta branch' referred to operating net profit of the branch").

Plaintiff contends, however, that based upon her review of the branch profit and loss statements produced by Defendant and reviewed during Doernte's and Grubenmann's depositions, the Atlanta branch financially outperformed all the other branches except one. Specifically, Plaintiff correctly points out that the Atlanta branch's *net* profit increased 659.2% from 2000 to 2001. Thus, Plaintiff argues that Defendant could not have legitimately relied on the Atlanta branch's performance as a reason for its decision to transfer Plaintiff from her branch manager position, and that Defendant's proffered reason in this regard is merely pretextual.

Unfortunately for Plaintiff, Defendant's corporate managers were concerned with the Atlanta branch's declining *operating* profit, not the *net* profit, because "the branch is only responsible for the operational profit." (Doernte Dep. at 40.) When asked what it meant to "grow the Atlanta branch," Doernte testified that the phrase referred to growing the branch's gross and operating profit. *Id.* at 38. It is clear from Defendant's profit and loss statements that a branch's net profit is calculated by adding "non-operating profit" (or loss) to the branch's "profit/loss from operation." [5] *See id.* Ex. 12; Grubenmann Dep. Exs. 15–16. Only when the "*non*-operating profit," for which Plaintiff and Defendant's other branch managers were not responsible, is considered does the Atlanta branch's financial performance exceed that of the other branches.

Comparing only *operating* profit (or loss), as Defendant did to measure its branch managers' performance, the Atlanta branch's operating profit decreased 71.6% from 2000 to 2001, ranking it twelfth among seventeen branches. *Id.* From 1998 to 2001, the Atlanta branch's operating profit decreased 76.9%, ranking it elev-

---

**5.** Defendant's profit and loss statements do not define "non-operating profit," which is shown on the statements immediately below the operating profit/loss, or explain how non-operating profit is calculated.

enth among sixteen branches. *Id.* Thus, it is undisputed that Defendant's expressed concern over the Atlanta branch's declining financial performance was legitimate, and Plaintiff has not created a genuine issue of fact as to whether Defendant's stated reliance on this financial information was pretextual.

### ii. The Corporate Managers' Beliefs About Plaintiff's Performance

■ The central inquiry in all intentional discrimination cases is the employer's underlying motivation for its actions. *Reeves*, 530 U.S. at 141, 120 S.Ct. at 2105 ("When a plaintiff alleges disparate treatment, 'liability depends on whether the protected trait ... actually motivated the employer's decision.'"). In determining whether an employer's stated reasons for its actions are pretextual, courts will not second-guess an employer's business judgment, and "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer." *Chapman*, 229 F.3d at 1030.

■ Rather than present evidence that discriminatory animus motivated Defendant's corporate managers in their decision to transfer Plaintiff from her branch manager position, Plaintiff has challenged the corporate managers' judgment and the sincerity of their beliefs. For example, in response to Defendant's assertion that Plaintiff failed to grow the Atlanta branch, Plaintiff responded that "Grubenmann had to have known that information was not accurate." (Pl.'s Stmt. of Mat. Facts ¶ 24.) Plaintiff also stated that "it is unbelievable that high turnover is a real or legitimate reason for my termination," (Pl.'s Aff. ¶ 16), and "Hussey could not have believed that [Plaintiff's] instructions were a fraudulent way of avoiding paying proper tariffs." (Pl.'s Resp. to Def.'s Stmt. of Mat.

Facts ¶ 11.) However, the correctness of the managers' judgment regarding Plaintiff's performance is not at issue, and Plaintiff cannot raise a material issue of fact as to pretext by second-guessing their decisions. *See Chapman*, 229 F.3d at 1030.

Despite her statements questioning the corporate managers' asserted beliefs regarding her performance, Plaintiff admits to many of the "problems" that formed the basis for the managers' decisions. For example, Plaintiff admits that, while she was branch manager, the Atlanta branch had a problem with high employee turnover and that the March 2001 internal compliance audit of her branch turned up some "serious problems." (SMF ¶¶ 15, 41–44; Bassano Dep. at 96–97.) Indeed, Plaintiff admits that the March 2001 audit revealed that some of her customers' international shipments left Defendant's bonded warehouse without clearance documents required by federal law, that her branch entered incorrect tariff classifications for some shipments, and that over half of the Atlanta branch's customer files audited had not been timely billed in accordance with corporate policy. (SMF ¶¶ 42–44.)

Plaintiff testified that, as branch manager, she was responsible for problems that occurred in the Atlanta branch. (Bassano Dep. at 96–97.) Thus, Plaintiff's own admissions regarding the Atlanta branch's problems support Defendant's asserted non-discriminatory reasons for deciding to transfer her from the branch manager position. *See Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir.1989) ("Admission of misconduct provides sufficient foundation for an employer's good faith belief that an employee has engaged in misconduct.").

■ Plaintiff argues that Defendant took no adverse action against other branch managers who performed poorly with regard to internal compliance audits,

employee turnover, and their branches' financial performance. Other than conclusory statements devoid of any support in the record, however, Plaintiff presents no evidence of unequal treatment or discipline among Defendant's branch managers. Title VII and the ADEA do not require identity of treatment among an employer's employees, but require only that different treatment not be grounded in discriminatory animus. *See E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1319 (10th Cir.1992) (holding that an unexplained disparity in treatment between employees does not necessarily establish illegal discrimination). As discussed below, there is no evidence that age or gender played any role in Defendant's treatment of Plaintiff or any of its branch managers.

### iii. Plaintiff has Presented no Evidence of Age or Gender–Based Discriminatory Animus

Even assuming that Defendant's stated reasons for its adverse action against Plaintiff were false, there is simply no evidence of age or gender discrimination other than Plaintiff's own subjective beliefs. Plaintiff testified that she believed Defendant's corporate managers discriminated against her on the basis of her age because they totally disregarded her good employment history with Defendant as evidenced by the previous management's praise of her performance. (Bassano Dep. at 175–76.) Plaintiff believed that the new managers were "out to get" her. *Id.* at 176. However, that previous managers considered Plaintiff a good employee does not create a genuine issue of fact as to whether the new managers' stated reasons for deciding to transfer her were a pretext for age or gender-based discrimination. *See Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir.2002) ("Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important."); *Chapman*, 229 F.3d at 1031 n. 21 ("Different decision-makers are entitled to be concerned about different things.").

Plaintiff cannot rely on suspicion or conjecture to prove that unlawful discrimination motivated Defendant to transfer her from her branch manager position. *See Walker v. NationsBank of Fla. N.A.*, 53 F.3d 1548, 1558 (11th Cir.1995) (noting that "[t]he record raises a suspicion of mendacity, but suspicion will not allow [plaintiff] to prevail under Title VII or the ADEA"). Like the plaintiff in *Walker*, Plaintiff "has not demonstrated that age or sex motivated [Defendant's] ... decision." *See id.* Plaintiff avers that Grubenmann "wanted to replace me with a younger male employee," (Pl.'s Aff. ¶ 10), but rather than producing specific evidence to support her assertion, she testified only that she had a "feeling" about Grubenmann's motivations. (Bassano Dep. at 178.) Plaintiff's personal belief that Defendant unlawfully discriminated against her, no matter how strongly held, cannot create a genuine issue of pretext when that belief is unsupported by any evidence in the record of age or gender bias.

Indeed, the only evidence relating to Defendant's alleged consideration of Plaintiff's age and gender is Plaintiff's own testimony, which undermines her allegations. Plaintiff testified that she believed "[Doernte] did what he wanted to do irregardless of what ... the job performance was, what the age of the person was ... whether it was a male or a female." (Bassano Dep. at 177–78.) Plaintiff further testified "I'm not sure that it was [Doernte]. I have a feeling it was Mr. Grubenmann," and when asked how she knew this, Plaintiff responded "I don't. I

have a feeling that it was." *Id.* at 178.[6] Thus, Plaintiff's own testimony suggests that Doernte did *not* take employees' age or gender into account when making decisions, and the only evidence of Grubenmann's alleged discriminatory bias is Plaintiff's "feeling." Plaintiff has presented no evidence, and the Court finds none in the record, of discriminatory bias by any of Defendant's other corporate managers. Accordingly, Plaintiff has failed to create a genuine issue of fact regarding whether Defendant's proffered legitimate reasons for transferring her from her branch manager position were a pretext for unlawful discrimination.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [# 12–1] is **GRANTED** on all of Plaintiff's claims.

**6.** In her affidavit submitted in response to Defendant's motion for summary judgment, Plaintiff avers that she does "not understand what [she] was trying to state" in her deposition but that she is confident she was not trying to "imply that Doernte did not take age or gender into account with respect to employment decisions." (Bassano Aff. ¶ 10.) However, Plaintiff's deposition testimony reflects no confusion or misunderstanding on this issue. Because Plaintiff has offered no credible explanation for the inconsistencies between her affidavit and her deposition testimony, the Court disregards Plaintiff's affidavit to the extent it contradicts her prior sworn testimony. *See McCormick v. City of Fort Lauderdale,* 333 F.3d 1234, 1240 n. 7 (11th Cir.2003) (noting that a court "may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony"). *See also Tidwell–Williams v. Northwest Ga. Health Sys., Inc.,* No. 1–97–CV–1726A–JEC, 1998 WL 1674745, at *5–*6 (N.D.Ga. Nov.19, 1998) (Carnes, J.) ("It is well settled that self-serving, conclusory affidavits submitted by a nonmoving party in opposition to a motion for summary judgment will not create an issue of fact for trial.") (citations omitted).