**ZURICH AMERICAN INSURANCE COMPANY, a foreign corporation,**
**Plaintiff,**

v.

**FRANKEL ENTERPRISES, INC., a foreign corporation, Nicholas C. Pedano, an individual and Mary B. Pedano, an individual, Defendants.**

No. 04–80727–CIV.

United States District Court, S.D. Florida.

Aug. 28, 2007.

Sina Bahadoran, Hinshaw & Culbertson, Miami, for Zurich American Insurance Company, Counter Defendant.

Brandon Jon Richard Douglas, Brandon J. Douglas, Fort Lauderdale, for Frankel Enterprises, Nicholas C. Pedano, Mary B. Pedano, Defendants.

Duncan J. Farmer, Burger Trailor & Farmer, West Palm Beach, for Frankel Enterprises, Mary B. Pedano, Nicholas C. Pedano, Defendants.

James Thomas Ferrara, Sachs Sax & Klein, Boca Raton, for Frankel Enterprises, Mary B. Pedano, Nicholas C. Pedano, Defendants.

Ronald Lee Kammer, Hinshaw & Culbertson LLP, Miami, for Zurich American Insurance Company, Counter Defendant.

Kerry Ann Raleigh, Sachs Sax & Klein, Boca Raton, for Frankel Enterprises, Mary B. Pedano, Nicholas C. Pedano, Defendants.

### ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

ALAN S. GOLD, District Judge.

THIS CAUSE is before the Court upon Plaintiff Zurich American Insurance Company's ("Zurich") Motion for Summary Judgment [DE 77]. The parties have filed responses, replies, sur-replies, and sur-sur replies. Having reviewed the parties' arguments and the relevant case law, I conclude that oral argument is not necessary, and that summary judgment should be entered for Zurich.

### I. Factual Background

#### A. Undisputed Facts

In the underlying action, Nicholas C. Pedano and Mary B. Pedano ("the Pedanos") purchased a house from Frankel Enterprises, Inc. ("Frankel") in 1992, and soon experienced water infiltration and roof leaks. Frankel attempted to make repairs, but did not correct the defects, causing continued leaks. Plaintiff's Statement of Undisputed Facts, DE 77 ¶ 1. In or about 2000, the Admiral's Cove Home-

owners Association pressured cleaned the house's roof, and water leaked into the house because of Frankel's allegedly faulty workmanship and inadequate repairs. *Id.* at 2. The Pedanos filed suit against Frankel, and brought claims for loss of consortium and personal and property damages resulting from water infiltration and mold caused by Frankel's alleged negligence. Defendant's Statement of Contested and Omitted Facts, DE 80, p. 2.[1]

Zurich had issued a Commercial General Liability Policy with a $1 Million each occurrence policy limit, for the period from June 30, 2000 through June 30, 2001, that lists Frankel as an additional insured. Plaintiff's Statement of Undisputed Facts, DE 77, p. 3. In pertinent part, the policy includes these conditions:

**SECTION IV .. COMMERCIAL GENERAL LIABILITY CONDITIONS**

2. Duties in The Event of Occurrence, Claim or Suit.

c. You and any other involved insured must. . . .

3. cooperate with us in the investigation or settlement of the claim or defense against the ..suit..; and

d. No insured will, except at that insured..s own cost, voluntarily make a payment, assume an obligation, or in incur any expense, other than for first aid, without our consent.

3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a ..suit.. asking for damages from an insured; or

---

1. Zurich does not contest these facts; it merely did not include them in its statement of undisputed facts.

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. **An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.**

*Id.* at 4 (emphasis added).

Frankel notified Zurich of a claim by the Pedanos in June 2002. *Id.* at 5. After the Pedanos filed suit, in a letter to Frankel dated January 10, 2003, in pertinent part, Zurich stated:

Based upon our review, it is Zurich's determination that it will participate in the defense of Frankel in connection with the referenced litigation pursuant to the following reservation of rights....

Zurich further stated:

Zurich reserves its rights to amend and/or supplement this letter and its coverage determination as set forth herein and as set forth in its prior correspondence at any time.

Zurich further stated:

Zurich has retained the law firm of Conroy, Simberg, Ganon, Krevans & Abel, P.A. The attorney to whom this matter has been assigned is Michael Kraft who may be contacted at (954) 961–1400.

*Id.* at 6.

In a letter to Frankel dated January 27, 2003, Zurich highlighted various policy provisions and made several statements concerning defense and coverage of the Pedano's claims against Frankel:

To the extent that the damages alleged and being sought by Pedano are not damages on account of "property damage" and/or "bodily injury" caused by an "occurrence" and to the extent that the damages may not have occurred during Zurich's policy periods then Zurich reserves all of its rights and defenses to disclaim coverage in connection with the referenced matter based on the application of the above policy terms.

\* \* \* \* \* \*

A review of the complaint shows that Nicholas C. Pedano alleges to have been diagnosed with aspergilliosis which is caused by exposure to molds found at the home owned by Frankel and sold to Pedano. Further Pedano alleges without specificity certain property damages that may have resulted from mold/mildew/fungus due to the water intrusion at the Pedano home. It is Zurich's determination that it has no obligation to indemnify Frankel in connection with any damages for either "property damage" and/or "bodily injury" and remediation costs arising from mold/mildew/fungus or by any other "pollutant" based on the application of the above referenced exclusion f. or "pollution" exclusion.

\* \* \* \* \* \*

To the extent that any of the damages alleged and being sought by Pedano are damages to "your work" and/or "your product" and arising from "your work" then it is Zurich's determination that such damages may be precluded from coverage based on the application of exclusions j., k., l., m. and n. Therefore, Zurich reserves all of its rights and defenses to disclaim coverage in connection with the referenced matter based on the application of exclusions j., k., l., m. and n. or the "your work" and "your product" exclusions.

\* \* \* \* \* \*

While Zurich will participate in the defense of Frankel it will continue to in its investigation of the referenced claim matter. Any action taken by Zurich in connection with its investigation of the referenced claim will not cause Zurich to either waive or be estopped from asserting any defense it may now have or have or hereafter have, known or unknown, in connection with the referenced litigation.

\* \* \* \* \* \*

Zurich reserves its rights to amend and/or supplement this letter and its coverage determination as set forth herein and as set forth in its prior correspondence at any time. While Zurich will participate in the defense of Frankel it will continue in its investigation of the referenced claim matter. Any action taken by Zurich in connection with its investigation of the referenced claim will not cause Zurich to either waive or be estopped from asserting any defense it may now have or hereafter have, known or unknown, in connection with the referenced litigation.

Should it be determined that Zurich has no obligation to defend Frankel in connection with the referenced matter, Zurich reserves its right to withdraw from the defense as well as seek back recoupment of any all payments made to or on behalf of Frankel either for defense or indemnification.

In connection with the above, Zurich has retained the law firm of Conroy, Simberg, Ganon, Krevans & Abel, P.A. The attorney to whom this matter has been assigned is Michael Kraft who may be contacted at (954) 961–1400.

Defendant's Statement, DE 80, Exhibit C.

Thus, as admitted, Zurich agreed to defend Frankel against the allegations in the lawsuit filed by the Pedanos in Case No. CA 02–15322AI. Admission, DE 78, ¶ 1. The following additional facts were admitted: (1) the attorney appointed by Zurich to represent and defend Frankel was Michael Kraft, Esquire of the law firm of Conroy, Simberg, Ganon, Krevans & Abel, P.A.; (2) after receiving the letter of January 27, 2003 from Zurich, Frankel did not reject the defense by Michael Kraft, Esq.; (3) Michael Kraft Esq. continued to defend Frankel through April 21, 2004; (4) Michael Kraft, Esq. continued to defend Frankel on April 22, 2004, during the court-ordered mediation; (5) prior to the April 22, 2004 mediation, Zurich never indicated to Frankel that it was unwilling to participate in the mediation; (6) Frankel did not obtain Zurich's authorization to enter into the Memorandum of Settlement reached during the April 22, 2004 mediation; (7) during the April 22, 2004 mediation, Frankel did not reject the defense by Michael Kraft, Esquire, and (8) following the April 22, 2004 mediation, Frankel did not reject the defense by Michael Kraft, Esquire. Following this letter, Frankel was represented by Michael Kraft. Plaintiff's Statement of Facts, DE 77, 8, 10, 11.

Attending the mediation were Tom Frankel, an executive officer of Frankel, Frankel's in-house counsel, Sherry Hyman, and Michael Kraft, along with the Pedanos and their attorney. A representative of Zurich, Mr. Anthony Flores, also attended the mediation by telephone. He did not appear by speaker phone. Defendant's Statement, DE 80, p. 11; DE 80, Deposition of Anthony Flores, page 17. Prior to the mediation, the parties had been negotiating that Frankel would buy back the home from the Pedanos, and provide some additional funds as part of the settlement. However, those negotiations were abandoned during mediation.[2]

**2.** It is unclear which party-the Pedanos, Frankel, or Zurich-abandoned the buy-back.

Defendant's Statement, DE 80, Deposition of Michael Kraft, p. 13–14. Ultimately, the mediation ended with Frankel and Pedano entering into a settlement for $1.8 Million without the express consent of Zurich. *Id.* at 12. The Policy had a One Million Dollar ($1,000,000.00) limit for each occurrence.[3]

## B. Partially Disputed Facts

Certain facts surrounding the mediation are disputed, as follows:

During deposition, Michael Kraft stated that he had the authority to offer $50,000 to settle the Pedanos' claims, and that he informed all parties of this offer. (DE 80, pp. 94–96). However, Sherry Hyman, Frankel's in-house counsel, testified by affidavit that Kraft stated during mediation that Zurich had not authorized him to offer any money whatsoever to settle the claims. DE 80, p. 11, Affidavit of Sherry Hyman, ¶ 18. Specifically, she stated that Mr. Kraft explained that Zurich "refused to offer one cent toward settlement." DE 80, ¶ 18. Similarly, Stephen Cohen, co-counsel for the Pedanos, testified by affidavit that Kraft never offered to settle the claim for any amount, and instead, maintained that Zurich was denying coverage of the claims. DE 80, p. 74, Affidavit of Stephen Cohen, ¶ 6. I do not find this conflict to be material given the admission that Zurich never authorized the actual consent judgment.

Sherry Hyman testified by affidavit that after Kraft explained that Zurich would offer no money to settle, either the Pedanos' attorney or Kraft suggested that Frankel could enter into a consent judgment with the Pedanos which could then be assigned to Pedanos. DE 80, p. 11, Affidavit of Sherry Hyman, ¶ 18. Although Hyman is uncertain which attorney made that suggestion, she states that Kraft was present during the negotiations between the Pedanos and Frankel. *Id.* Hyman said that Mr. Kraft "consented" to Frankel's negotiation and agreement to same. *Id.* She stated: "Mr. Frankel and I specifically asked Mr. Kraft if Frankel could enter into such as settlement and consent judgment, to which he affirmed that Frankel could do so." *Id.* She stated: "After initial settlement terms were discussed, Mr. Kraft continued to speak with the Zurich representative via telephone ..." and "[A]fter his telephone conversation, Mr. Kraft did not advise us to not enter into the settlement and consent judgment." *Id.* at ¶ 19. She further states that Kraft assisted in the drafting of the settlement and consent judgment which took the form of a Memorandum of Understanding that was signed by Frankel and Pedanos. *Id.* at 21. Hyman states that had Kraft advised Frankel not to enter into the settlement agreement, Frankel would not have done so. *Id.* at 24.

The Hyman affidavit, however, does not state that Mr. Kraft, in response to a question by Ms. Hyman or anyone else, directly stated that the Zurich representative had approved the settlement. Nor does the Hyman affidavit state that Mr. Kraft told anyone that the Zurich representative authorized him to negotiate the settlement on the Frankel's behalf. To

---

3. According to Zurich, Frankel paid a mere $50,000, got a convent not to execute, and assigned its rights against Zurich for $1.8 million. Zurich's Reply Brief, DE 81, page 9. *See also* Hyman Affidavit, ¶ 22. Zurich states that Frankel consented to the $1.8 million consent judgment for claims like "loss of consortium," and damages include "pain and suffering," "mental anguish," and "loss of capacity for enjoyment of life." By not authorizing and consenting to the settlement, Zurich had no say as to the amount or the claimed damage elements. The Defendants now seek to impose the entire judgment amount on Zurich.

the same effect, Mr. Stephen M. Cohen, co-counsel for the Pedanos, stated in his affidavit that "... [Kraft] did [not] inform the parties present that Zurich was offering any money settlement at all ... [and] Mr. Kraft maintained that Zurich was maintaining its denial of insurance coverage to its insured, Frankel Enterprises, Inc., and provided a copy of Zurich's letter denying coverage to Affiant." DE 80, ¶ 6, page 74. Mr. Cohen further stated in his affidavit that "[W]hile leaving the building where the mediation was conducted, Mr. Kraft stopped his car and rolled down his window to advise me that Zurich was 'pissed' at him for allowing the settlement." *Id.* at ¶ 7.

The uncontradicted evidence of record is that the Zurich representative did not approve the settlement terms and specifically said that to Kraft. Zurich's representative, Anthony Flores, testified by deposition that Mr. Kraft told him that Plaintiffs and Defendants were "about to strike a deal," but, at that point, he did not understand what the deal was or that the "deal was his [Kraft's] idea." DE 80, Deposition of Anthony Flores, page 20. At the end of the mediation, Kraft told him over the telephone that there would be a consent judgment signed. *Id.* Mr. Flores told Kraft that he objected to it. *Id.* at 21. He did not recall if he instructed Kraft to tell anyone else about his objection. *Id.* "**I just remember telling him that Zurich did not support that type of settlement.**" *id.* (emphasis added).

## C. Procedural Posture

Following the settlement between Frankel and the Pedanos, Zurich informed Frankel that it was not bound by the settlement due to the fact that Frankel had entered into the settlement without authorization by Zurich. On August 5, 2004, Zurich filed a declaratory action, requesting that the court find that Zurich was not bound by the settlement agreement.

The case was originally before Judge Paine and was transferred to me on June 12, 2007. Zurich's motion for summary judgment was fully briefed prior to the transfer, and the motion is now ripe for resolution.

## II. Legal Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 252, 106 S.Ct. 2505; *Bishop v. Birmingham Police Dep't*, 361 F.3d 607, 609 (11th Cir.2004).

The moving party bears the initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). Once the moving party satisfies this burden, the burden shifts to the party opposing the motion to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir.2001).

In assessing whether the movant has met its burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-moving party. *Denney,* 247 F.3d at 1181. In determining whether to grant summary judgment, the court must remember that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

### III. Analysis

■ Although the Defendants raise a number of legal arguments supported by nonmaterial facts, two direct legal principles apply here which warrant summary judgment for Zurich on the undisputed material facts: an insurer is not bound by an authorized settlement unless: (1) the insurer refuses to defend, *First Am. Title Ins. Co. v. Nat'l Union Fire Ins. Co.,* 695 So.2d 475, 477 (Fla. 3d DCA 1997) ("Thus, while an insured is free to enter into a reasonable settlement when its insurer has wrongfully refused to provide it with a defense to a suit, we find that the insured is not similarly free to independently engage in such settlements where, as here, the insurer had not declined a defense to suit"); or (2) the insurer defends under reservation of rights and the insured rejects that defense. *United Nat. Ins. Co. v. Jacobs,* 754 F.Supp. 865, 870 (M.D.Fla. 1990) ("By neither rejecting the defense nor acquiring UNIC's consent, Jacobs breached the terms of the policy when he settled the lawsuit with the Perrys").

As further stated by the Florida Third District Court of Appeals in *American Reliance Insurance Company v. Perez,*

> We conclude that the summary judgment was improvidently entered in favor of the Browns, and that American Reliance is entitled to judgment in its favor.

As stated in *First American Title Insurance Co. v. National Union Fire Insurance Co.,* 695 So.2d 475 (Fla. 3d DCA 1997):

> **[W]hile an insured is free to enter into a reasonable settlement when its insurer has wrongfully refused to provide it with a defense to a suit, we find that the insured is not similarly free to independently engage in such settlements where, as here, the insurer had not declined a defense to suit. Consequently, we agree with the trial court that the insured's failure to comply with the relevant policy provisions relieved the insurer of its obligations under the policy and precluded this action against the carrier as a matter of law.**

*Id.* at 477. In *First American Title,* the insurance policy directed the insured not to " 'admit liability for or settle a claim . . . without the written consent of the [insurer].' " *Id.* at 476.

The Perezes and the Browns argue that the American Reliance policy does not contain language prohibiting settlement without the insurer's consent. It is true that the present policy is worded differently, but we think the substance is the same. The homeowners policy provided:

> 3. Duties After Loss. In case of an accident or occurrence, the insured will perform the following duties that apply. You will help us by seeing that these duties are performed:
>
> c. at our request, help us:
>
> (1) to make settlement; . . . .
>
> (3) with the conduct of suits and attend hearings and trials;
>
> (4) to secure and give evidence and obtain the attendance of witnesses;
>
> . . .

e. *the insured will not except at the insured's own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the bodily injury.*

(Emphasis added). **It has been held that this language requires the insured to obtain the insurer's consent before settling.** *See United Nat'l Ins. Co. v. Jacobs,* 754 F.Supp. 865, 870 (M.D.Fla.1990).

The order under review is reversed and the cause remanded with directions to enter judgment in favor of American Reliance.

*Am. Reliance,* 712 So.2d 1211, 1212–13 (Fla. 3d DCA 1998) (emphasis added).

Here, the undisputed material facts establish that Zurich at all times defended under a reservation of rights, for over fifteen months, between January 27, 2003 and when Frankel entered the consent judgment; that Frankel never rejected that defense, and that Frankel entered into a consent judgment for $1.8 million without obtaining Zurich's signed consent in writing as required by the clear policy terms ("Per the policy, 'An agreed settlement means a settlement and release of liability signed by us . . . .' ") By doing so, Frankel breached the policy's cooperation and "no action" provisions, and Zurich is entitled to summary judgment, even if, as Defendants claim, Zurich offered not "one cent" at mediation.

■ Zurich correctly notes that under Florida law, in fulfilling its duty to defend, "the insurer employs counsel for the insured, performs the pretrial investigation, and controls the insured's defense after a suit is filed on a claim. The insurer also makes decisions as to when and when not to offer or accept settlement of the claim." *Doe on Behalf of Doe v. Allstate Ins. Co.,* 653 So.2d 371, 373 (Fla.1995). The insurer's "right to control the defense is 'a valuable one in that it reserves to the insurer the right to protect itself against unwarranted liability claims and is essential in protecting its financial interest in the outcome of litigation.' " *Travelers Indem. Co. of Ill. v. Royal Oak Enter., Inc.,* 344 F.Supp.2d 1358, 1374 (M.D.Fla.2004). The insured "has the reciprocal obligation to allow the insurer to control the defense and to cooperate with the insurer." *Doe,* 653 So.2d at 373.

■ As a corollary to the insurer's important duty to defend, an insured is permitted to enter into a consent judgment, commonly known as a "Coblentz" agreement, and bind its insurer—but, only if the insurer refuses to defend. *Cosmopolitan Mut. Ins. Co. v. Eden Roc Hotel,* 258 So.2d 310, 312 (Fla. 3d DCA 1972) ("It is a well-settled principle that where an insurer is obliged to defend its insured and pay damages in its behalf, and the carrier, is duly notified of the suit against its insured and full opportunity is afforded to defend the action, yet it refuses to do so, then the judgment will be conclusive against the insurer") (citing *Coblentz v. Am. Sur. Co. of N.Y.,* 416 F.2d 1059 (5th Cir.1969)). The reasoning is that "where the insurer refuses to defend, the insured can take whatever steps are necessary to protect itself from a claim." *Employers Reinsurance Corp. v. Amphion Holdings Inc.,* 733 So.2d 588, 590 (Fla. 3d DCA 1999).

■ Zurich also correctly states that under Florida law, an insurer can defend its insured under reservation of rights to later deny coverage. "[A]n insurer does not breach its duty to defend by offering to defend only under a reservation of rights." *Travelers Indem.,* 344 F.Supp.2d at 1370; *First Am.,* 695 So.2d at 477. If an insured defends under reservation of rights, Florida law provides that the insured may reject the defense, retain its own counsel, and control the defense, including entering into a settlement agreement with the

claimant. *Travelers Indem.*, 344 F.Supp.2d at 1370. However, unless the insured rejects the defense, it cannot wrest control of the defense and bind the insurer to the settlement.

■ Finally, Zurich correctly notes that an insurer cannot be bound by an unauthorized settlement when it has not refused to defend, even if it denies coverage. *Philadelphia Indem. Ins. Co. v. Kohne*, 294 F.Supp.2d 1319 (M.D.Fla.2003), *reversed on other grounds*, 181 Fed.Appx. 888 (11th Cir.2006). *Kohne* is particularly instructive here. In *Kohne*, the insurer denied coverage. The claimant filed suit against the insured, and without notifying her insurer, the insured entered into a $4 million consent judgment. The district court held, in part, that the insurer's denial of coverage did not excuse the insured's breach of the cooperation clause, because the insurer did not refuse to defend: "Because Philadelphia only denied coverage, but did not refuse to defend, Amuchienwa's breach of the duty of cooperation remains unexcused." *Id.* Zurich correctly argues here that even if the January 27, 2003 letter constituted a denial, Frankel nonetheless breached the policy's cooperation and "no action" provisions when it entered into an unauthorized settlement while simultaneously being defended.

Frankel does not dispute the accuracy of the legal statements made by Zurich. Frankel's contention is that under the facts of this case, Zurich did not actually defend Frankel's case.

■ First, Frankel argues that the January 27, 2003 letter constitutes a denial of coverage, which would render Zurich's continued defense of Frankel a sham. According to Frankel, if Zurich denied coverage on January 27, 2003, it had no motivation to participate in the mediation in any meaningful fashion, and the alleged defense during mediation was a sham defense. I disagree with Frankel's argument. The January 27, 2003 did not constitute a denial of coverage. While the letter did deny coverage as to certain claims, the letter did not deny coverage as to all of the Pedanos' claims against Frankel. The letter denied coverage only as to claims resulting from mold or other pollutants in the Pedanos' home:

> A review of the complaint shows that Nicholas C. Pedano alleges to have been diagnosed with aspergilliosis which is caused by exposure to molds found at the home owned by Frankel and sold to Pedano. Further Pedano alleges without specificity certain property damages that may have resulted from mold/mildew/fungus due to the water intrusion at the Pedano home. It is Zurich's determination that it has no obligation to indemnify Frankel in connection with any damages for either "property damage" and/or "bodily injury" and remediation costs arising from mold/mildew/fungus or by any other "pollutant" based on the application of the above referenced exclusion f. or "pollution" exclusion.

However, as to the remaining claims, Zurich did not deny coverage, but only reserved its right to deny coverage if it found the claims were not covered. Such a partial denial of coverage does not constitute a denial of coverage which would render Zurich's participation in the mediation a sham.

■ Frankel also points to the events at mediation in which Zurich, through Kraft, allegedly stated that Zurich was denying coverage on Frankel's claim, and would offer nothing toward a settlement. Frankel emphasizes that Kraft assisted in drafting the settlement documents between Frankel and the Pedanos, and at no time informed Frankel that the settlement would not bind Zurich.

Assuming the truth of these facts, they do not change Frankel's clear admission

that Frankel did not obtain Zurich's authorization to enter into the Memorandum of Settlement reached during the April 22, 2004 mediation. DE 78, ¶ 9. By the clear terms of the policy, "No insured will, except at the insured's own cost, voluntarily make a payment, assume an obligation, or incur any expense, other for first aid, without our consent."

■ Despite this admission, Frankel now argues that he was advised by Attorney Michael Kraft to go forward with the settlement, and that Zurich thus "tacitly" authorized the settlement. However, under Florida law, Mr. Kraft is an independent contractor and Zurich is not vicariously liable for actions taken by Kraft, over which Zurich had no control. *See Aetna Cas. & Sr. Co. v. Protective Nat. Ins. Co. of Omaha*, 631 So.2d 305, 306–307 (Fla. 3d DCA 1993) (holding, in the context of an attorney malpractice suit, "an insurance company is not vicariously liable for the [acts] of the attorney it selects to defend the insured.... 'While [the insurer] selected [the attorney] to defend [the insureds] and controlled the ultimate decision to settle or defend under the policy, there is nothing in the record to indicate [the insurer] had any control over the details of the litigation as it was being conducted by the [the attorney].)' "

Here, Frankel cannot avoid the effect of his own admission by relying on the Hyman affidavit to argue that Frankel entered into the settlement agreement with Zurich's knowledge and tacit approval. *See Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir.2005) ("When the nonmovant has testified to events, we do not (as urged by Plaintiff's counsel) pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record that we deem most helpful to the nonmovant... Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or in part."); *McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1240 n. 7 (11th Cir.2003) (holding that the court may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony and the nonmovant does not explain the discrepancies). The same rule likewise applies to admissions. *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 549 (6th Cir.2000) ("Plaintiffs are bound by admissions in their pleadings, and a party cannot create a factual issue by subsequently filing a conflicting affidavit".) Moreover, the "tacit admission" theory is directly contrary to (1) the other statements in the Hyman and Cohen affidavits that Kraft stated that Zurich would *not offer one dime of settlement* and was maintaining the denial of insurance coverage to its insured; and to (2) Anthony Flores' uncontradicted deposition testimony that Kraft was not authorized to settle on Zurich's behalf. Given all inferences in favor of the Defendants, the best that the evidence establishes by inference is that Kraft acted independently and without the authorization of Zurich.

Frankel raises other legal arguments that are likewise unavailing. First, it argues that "[o]nce any insurer wrongfully denies coverage, it waives any requirement (or is estopped from asserting any requirement) of prior notice and consent before the insured settles a claim with a third-party." Opp. at 16. In support, Frankel relies on a single case from the Florida Fourth District Court of Appeals, *Kovarnik v. Royal Globe Ins. Co.*, 363 So.2d 166 (Fla. 4th DCA 1978), which is plainly distinguishable, at best. The insurance policy at issue in *Kovarnik*, unlike this policy, did not contain a "consent clause" and the court was unwilling to inject a consent obligation as a matter of law. *Id.* at 169.

Here, the Zurich policy contains cooperation and "no action" provisions. Also, *Kovarnik* involved a first party claim for coverage; that is, there was no duty to defend. In this case, Zurich defended Frankel for fifteen months. I conclude that *Kovarnik* is limited to its facts and has no application in this case.

■ While Defendants recognize that an insurer has a right to provide a defense under a reservation of right to determine whether coverage exists, they argue, relying on Section 627.426 of the Florida Statutes, that "to avail itself of this right, the insurer must provide notice to the insured of its reservation of rights, obtain a non-waiver agreement from the insured, or retain independent counsel, which is mutually agreeable to the parties." Opp. at 7. The Defendants then argue that Zurich's failure to comply enabled Frankel to enter into the settlement consent judgment.

Even assuming Defendants' facts to be true, I conclude, as a matter of law, that Section 627.426 does not apply here because Frankel's policy was not issued for delivery or delivered in Florida but rather in New York.[4] DE 1, DE 10, ¶¶ 16. Section 627.401(2) excepts policies not issued or delivered in Florida. That section serves as a "gateway" and expressly states that none of the sections in Part II ("Insurance Contracts") apply to insurance policies "not issued for delivery in this state nor delivered in this state...." *See Sheehan v. Lumbermens Mut. Cas. Co.,* 504 So.2d 776, 778 (Fla. 4th DCA 1987) ("Section 627.726 [5] says that all contracts of casualty insurance covering subjects residing, located or to be performed in Florida shall be subject to the applicable provisions of Part II. One of the provisions of Part II is section 627.401(2), which limits the applicability of that section to policies issued for delivery or delivered in the state. Because appellants make no contention that the policy in question was issued for delivery in the state or delivered in the state or even that Lumbermens had reason to know that Ms. Feldman was going to school in Florida, *Brooks v. Sturiano,* 497 So.2d 976 (Fla. 4th DCA 1986) controls."). Thus, based on the plain language of the statute, since the subject insurance policy was not issued for delivery or delivered in Florida, Part II of Chapter 626, which includes Section 627.426, does not apply.

Moreover, even if Zurich's policy was delivered or issued for delivery in Florida, Defendants' argument is still flawed. The obligations imposed under Section 627.426 apply strictly to a denial of coverage based on a "coverage defense." Because Zurich raised the potential for lack of coverage, as opposed to a coverage defense, in its reservation of rights letter, Zurich was not obligated to comply with Section 627.426 in that letter. *AIU Ins. Co. v. Block Marina Inv., Inc.,* 544 So.2d 998, 1000 (Fla.1989) ("We do not construe the term to include a disclaimer of liability based on a complete lack of coverage for the loss sustained."); *Solar Time Ltd. v. XL Specialty Ins. Co.,* 2004 WL 1683149, *5 (S.D.Fla. June 15, 2004) ("The law in Florida is now well-settled with respect to the difference between a 'coverage defense' and a denial of coverage. A 'coverage defense' is a defense to otherwise-existing coverage. A denial or disclaimer of coverage based on a complete lack of coverage in the first instance is not a 'coverage defense.' ").

---

4. In Paragraph 16 of DE 10, Defendants admit that Zurich issued a policy to HWI Global Properties, Inc. Of New York, New York a commercial general liability insurance policy, No. GLO 2871475–02

5. Section 627.726 of the Florida Statutes was renumbered as Section 627.4135.

In this case, Zurich argues that Frankel breached the cooperation and "no action" provisions of the policy, and these arguments are "coverage defenses" under Section 627.426. *See id.* Those defenses, however, arose in April 2004, over a year after Zurich sent its reservation of rights letter. Defendants incorrectly rely on those *April 2004* breaches (the coverage defense) to argue that Zurich had an obligation to comply with Section 627.426 in the *January 2003* reservation of rights letter. Accordingly, I conclude that their argument lacks legal merit for this reason as well.

Third, the Defendants, in essence, argue that the "duty to defend" includes a duty to settle, so that the failure to settle [constituting a "sham defense"] is a breach of the duty to defend, entitling Frankel to enter into the unauthorized consent judgment. In the context of a "non-bad faith claim," however, Florida law does not support such a novel concept. The Defendants cases (as cited in their briefs) simply do not apply here because they involved secondary "bad faith" claims [6] against the insurers after judgment for unjust denial of coverage and/or a refusal to defend. Such a rule, as proposed by the Defendants, would lead to incongruous results such that every time an insurer defends under a reservation of rights and does not offer to settle during mediation (or, any time after suit is filed), the insured, without rejecting the defense, could unilaterally settle with the plaintiff beyond the policy limits and bind the insurer. To adopt such a rule would negate the opportunity for the insured to prevail at trial or settle within the policy limits, with no personal exposure to the insured. Rather, in exchange for the benefit of a defense given to the insured, the insurer has a right to make "decisions as to when and when not to offer or accept settlement of the claim." *Doe*, 653 So.2d at 373.

Moreover, the Defendant's proposed rule improperly confuses the two distinct obligations that Zurich had under its insurance contact: (1) the duty to defend and (2) the duty to indemnify. Zurich satisfied the first by defending Frankel. The second obligation-to indemnify Frankel in the event a judgment was entered for damages covered under the policy—never materialized because there was no judgment.

In Florida, courts have uniformly held that the duty to defend is fundamentally distinct from the duty to indemnify. *See Allstate Ins. Co. v. RJT Enters, Inc.*, 692 So.2d 142, 144–45 (Fla.1997) ("The duty to indemnify is a concept distinct from a duty to defend. The duty to defend is broader than the duty to pay. ... It encompasses responsibilities beyond the coverage limits. Indeed, the cost of providing a defense may exceed the amount paid to indemnify."); *Wendy's of N.E. Fla., Inc. v. Van-*

---

**6.** In a "typical" bad faith claim, the insurer had an opportunity to settle within the policy limits, did not settle, and a judgment is entered against the insured in excess of policy limits. In that scenario, the insurer is potentially liable for the entire judgment because it breached its duty to settle a case it was defending and judgment was entered in excess of policy limits. This is a patently distinct situation from when the insured enters into an unauthorized settlement prior to judgment, which the insurer is still defending, and there is the possibility that the insured will prevail or the action will settle within the policy limits, with no personal exposure to the insured. Here, by entering into the unauthorized consent judgment, Frankel prevented Zurich from defending the case to conclusion or settling within the policy limits. Under the terms of the policy, Frankel's unilateral action relieved Zurich of any obligation to pay the consent judgment. *See Kohne*, 294 F.Supp.2d at 1325 ("The Court finds Philadelphia's resulting inability to defend its interests and the entry of a $4,000,000.00 consent judgment against its alleged insured to be substantially prejudiced.").

*dergriff,* 865 So.2d 520, 522 (Fla. 1st DCA 2003) ("As a general rule, a liability insurer has a duty to defend its insured against claims; this duty is distinct from, and broader than, its duty to indemnify its insured."); *St. Paul Fire and Marine Ins. Co. v. Tingley Sys., Inc.,* 722 So.2d 849 (Fla. 2d DCA 1998) ("An insured's duty to defend its insured is distinct from, and broader than, its duty to indemnify its insured."). Thus, for all these reasons, I conclude that Defendant's argument that Zurich breached a "duty to settle" is patently without merit.

## IV. Conclusion

In light of the foregoing, I find that summary judgment should be entered for Zurich. .

Accordingly, it is **ORDERED and ADJUDGED** that Plaintiff's Motion for Summary Judgment [DE 77] is **GRANTED**.

Oral argument previously set for Friday, August 31, 2007 is hereby cancelled.

**DONE AND ORDERED.**