[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**JUNE 11, 2003**
**THOMAS  K. KAHN**
**CLERK**

No. 01-16567

_____

D. C. Docket No. 99-07516 CV-KLR


ANTHONY MCCORMICK,

                              Plaintiff-Appellant,

        versus

CITY OF FORT LAUDERDALE,
JONATHAN WELKER, Officer,

                              Defendants-Appellees.


_____


Appeal from the United States District Court
for the Southern District of Florida

_____


**(June 11, 2003)**


Before EDMONDSON, Chief Judge, ANDERSON, Circuit Judge, and POGUE[*],
Judge.

---

    [*] Honorable Donald C. Pogue, Judge, United States Court of International Trade, sitting by
designation.

PER CURIAM:

This appeal is about the use of force to make an arrest.

Plaintiff Anthony McCormick was pepper-sprayed and shot by Police Officer Jonathan Welker when Officer Welker attempted to arrest McCormick for aggravated battery. McCormick sued the City of Fort Lauderdale (City) and Officer Welker for, among other things, unlawful arrest and excessive force. The district court granted summary judgment in favor of the City and Officer Welker because the arrest was based upon probable cause and the officer's application of force was reasonable under the circumstances. We affirm.

BACKGROUND

McCormick always carried with him an ornate, wooden walking stick. McCormick claims he sometimes used the walking stick as a balancing point due to medical difficulties with his back and legs. On 17 May 1996, McCormick was loitering -- with his walking stick -- in the vicinity of the Unity Coin Laundry (Laundry) in Fort Lauderdale, Florida. McCormick entered the Laundry with his stick in hand, although he was making no use of the stick for walking assistance. Deborah Capuano, a white female, entered the Laundry and began to wash her

clothes at a nearby machine.  McCormick, a black man, apparently began a verbal altercation with Capuano by saying something to the effect of "bye-bye white race."[1]

McCormick put pieces of a banana peel into the soap dispenser and across the coin-deposit mechanism of the washing machine used by Capuano.  While McCormick continued his racial insults, he put the end of his walking stick inside Capuano's washing machine.  McCormick ordered Capuano to leave the Laundry, telling her also that she and all white people should go back west.  It was at this point that Turesa Hosein, an owner of the Laundry, called the police.

McCormick admitted that he was "taunting" Capuano by putting his hand "inside the water [of Capuano's washing machine] and basically just, like, flick[ing] the water in [Capuano's] face."  McCormick claims that he and Capuano separated briefly and that as he was exiting the Laundry Capuano appeared before him with her hands approaching his neck "with her nails pointing at [McCormick]."  McCormick then pushed Capuano; and Capuano fell backwards,

---

[1] In McCormick's affidavit of September 2001, which he submitted in response to the motions for summary judgment, McCormick acknowledges that racial slurs made on 17 May 1996 were attributed to him.  McCormick explains in his affidavit that he has no racist disposition, but does not specifically deny that he made the racial remarks to Capuano.

striking her head on the pavement.[2] Hosein called the police a second time, this time relaying that someone had been hurt at the Laundry.

As Capuano was lying on the ground and bleeding from her head wound, bystanders (including Hosein) attempted to render assistance to Capuano; but McCormick would let no one near Capuano.[3] One witness testified that McCormick would swing his stick at anyone who tried to approach Capuano; McCormick did not specifically deny that he was swinging the stick at bystanders. Hosein was eventually able to help Capuano to a chair that Hosein placed outside the Laundry.

In the meantime, Officer Jonathan Welker of the City of Fort Lauderdale Police Department, received a radio call from dispatch about a disturbance at the Laundry involving a black male making racial slurs and pushing a woman. Before Officer Welker arrived at the Laundry, he received another radio call from

---

[2] We convey here the version of events most favorable to McCormick. Other witnesses testified that McCormick pushed and hit Capuano with his walking stick without provocation, causing Capuano to fall and injure her head. Whether McCormick intended to harm Capuano when he pushed her forcefully enough to cause a bleeding head wound is immaterial to our decision on the allegations of unlawful arrest and excessive force.

[3] In his affidavit filed in opposition to the motions for summary judgment, McCormick claims that he knew that a person suffering from a head trauma should not be moved and that is why he kept the bystanders away from Capuano. This disputed fact is, again, immaterial to our decision on McCormick's allegations of unlawful arrest and excessive force.

4

dispatch that the situation was upgraded to an assault and that a white, female victim required emergency medical services.

Officer Welker testified at his deposition that, when he arrived at the Laundry, he saw a "white female sitting in a chair bleeding profusely from her head." Officer Welker asked Capuano what happened; and, through her crying, Capuano said someone had hurt her. She indicated by pointing with her thumb that her assailant was inside the Laundry. Hosein also indicated that the assailant was in the Laundry wearing a green shirt.[4] Officer Welker testified that, from the look of Capuano's injury, it was possible that an aggravated battery -- a felony -- had been committed.[5]

---

[4] McCormick admits he was wearing a green shirt on 17 May.

[5] Under Florida law, a simple battery becomes an aggravated battery when a person knowingly or intentionally "causes great bodily harm" or "[u]ses a deadly weapon." Fla. Stat. § 784.045. "Great bodily harm defines itself and means great as distinguished from slight, trivial, minor, or moderate harm, and as such does not include mere bruises as are likely to be inflicted in a simple assault and battery . . . ." Coronado v. State, 654 So. 2d 1267, 1270 (Fla. 2d DCA 1995)(quoting Owens v. State, 289 So. 2d 472, 474 (Fla. 2d DCA 1974)). The profusely bleeding head wound suffered by Capuano would not appear slight or trivial to a reasonable officer. And a stick also may be considered a deadly weapon, depending upon the circumstances in which it was used. Lindsay v. State, 64 So. 501, 501 (Fla. 1914)(stating that large stick may constitute deadly weapon in context of aggravated assault).
An aggravated battery is a felony in Florida. Fla Stat. § 784.045.

Officer Welker testified that he entered the Laundry and saw two men standing next to McCormick.[6] Officer Welker asked where was the assailant, and the men standing next to McCormick backed away and indicated that McCormick was the person in question. Officer Welker noticed that McCormick had a blunt object in his hand.

In his affidavit, McCormick claims that his back was to the door when Officer Welker entered the Laundry. McCormick says that he was conversing with another man when he heard someone shouting, "Hey, hey, hey." As McCormick turned to face the shouting person, "a mist of liquid hit [McCormick's] face and eyes and [he] immediately experienced a severe burning sensation and inability to catch [his] breath." McCormick claims in the affidavit that he was never told that he was under arrest nor was he asked to surrender before receiving the pepper spray in the face.[7]

---

[6] Officer Welker recognized McCormick from an earlier incident at a local hospital where Officer Welker was called to provide backup security. McCormick had been committed to the hospital because of a psychological episode, and there was fear, at that time, that he would react dangerously. Officer Welker testified that his earlier encounter with McCormick contributed to his fear of McCormick when they encountered each other again at the Laundry.

[7] Three days after the events at the Laundry (20 May 1996), McCormick gave a sworn statement to the police that was very favorable to Officer Welker. In that statement, McCormick admitted many things, including that he was told to drop the stick before being pepper-sprayed, but he refused to comply with that order. McCormick also admitted that he knew a police officer was at the Laundry on account of McCormick's contact with Capuano.

The affidavit that McCormick submitted on summary judgment contradicts some of the material facts in McCormick's earlier sworn statement to the police. Under the law of this Circuit,

Officer Welker testified that McCormick was unaffected by the administered pepper spray. "He turned his back to me. He wiped his eyes and turned right back around and looked at me like nothing had happened." As Officer Welker backed out of the Laundry, McCormick continued to advance toward Welker.[8] After McCormick refused to obey repeated orders to drop the

---

we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony. "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact [for summary judgment], that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." Van T. Junkins and Assoc., Inc. v. U.S. Industries, Inc., 736 F.2d 656, 657 (11th Cir. 1984)(emphasis added). Such an affidavit would be a sham.

But McCormick contends that the contradictions he later submitted in the affidavit are justifiable given his medical condition when he gave the sworn initial statement to the police. McCormick stated in the affidavit that the initial statement was given shortly after he underwent surgery for his gunshot wound, and he was recovering from the effects of anaesthesia and other pain medications.

Because McCormick offers some explanation for why his statements directly contradict one another -- an explanation that does not appear to us to be itself a complete sham -- we will accept and credit McCormick's affidavit submitted on summary judgment. Although McCormick's explanations may not credibly withstand cross-examination, weighing the contradictory statements along with the explanations for those contradictions are judgments of credibility. Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment.

In further support of his version of events, McCormick generally references his deposition. Defendants presented small excerpts of McCormick's deposition in their motions for summary judgment. But we have carefully reviewed the entire record before us, and it appears that McCormick never offered his deposition to the district court in opposition to summary judgment. Because the deposition of McCormick is no part of the evidentiary record of the case, we give McCormick's passing references to the deposition no consideration.

[8] McCormick later claimed in his affidavit that he was attempting to leave the Laundry because he desperately needed fresh air after receiving a chemical attack. McCormick's true subjective intent underlying his movement toward the officer is immaterial to the application of reasonable force on a perceived threat.

7

stick, Officer Welker delivered a second burst of pepper spray. According to Officer Welker, the second spraying also had no effect. Officer Welker radioed for a step-up of his backup response.

McCormick started to walk away with his stick still in hand, and Officer Welker holstered his pepper spray and drew his baton. Officer Welker unsuccessfully attempted to kick the stick out of McCormick's hand. Throughout these events, Officer Welker continually shouted for McCormick to drop the stick. In McCormick's affidavit, he claims that he "heard shouting but, at the time, [he] could not understand what anyone was saying." (In other words, even McCormick's affidavit given five years later creates no dispute of fact that McCormick was told to drop the stick after the pepper-spraying and before the shooting on 17 May 1996.[9])

After Officer Welker attempted unsuccessfully to kick the stick out of McCormick's hand, McCormick turned again on Officer Welker. According to Officer Welker, McCormick advanced with the stick raised above his head. Officer Welker testified that McCormick began pumping the stick at him as if he intended to strike Officer Welker. Witnesses verified that McCormick had the

---

[9] McCormick only claims now that he did not understand the command to drop the stick, which (at most) raises a dispute of immaterial fact.

stick raised above his head and was either pumping or swinging the stick at Officer Welker. Officer Welker drew his weapon and pointed it at McCormick. Some of the bystanders were then yelling for McCormick to drop the stick.

In the affidavit submitted in opposition to summary judgment, McCormick states only that he "lifted [his] hands in submission," fearing another confrontation with his alleged assailant. (The affidavit makes no mention of the stick in the events immediately preceding the shooting and, therefore, directly contradicts none of the evidence submitted by the defendants on this point.)

McCormick was advancing on Officer Welker with the stick raised in a striking position. While retreating from McCormick, Officer Welker tripped over a parking stone (that piece of concrete that defines the head of a parking space). Officer Welker testified that McCormick then charged Officer Welker as the officer went to the ground. Officer Welker fired a deliberate shot -- shooting at McCormick's center mass -- as Welker was falling. Both McCormick and Welker looked down and saw blood. But McCormick still had not dropped the stick and was continuing forward. Officer Welker feared that McCormick might have access to his firearm if McCormick successfully attacked him with the stick. Officer Welker fired a second shot at McCormick which missed him altogether.

9

Officer Livingston then arrived on the scene. Officer Livingston confirmed that when he arrived he saw McCormick -- with blood already on him -- approaching Officer Welker with the stick in his hands, while Officer Welker continually ordered McCormick to drop the stick. Officer Livingston pepper-sprayed McCormick with no apparent effect. Officer Livingston then rushed McCormick, unsuccessfully attempting to take McCormick to the ground. Both officers eventually took McCormick to the ground, but they were unable to restrain him. McCormick was able to rise again to his feet, requiring Officer Livingston to make a full tackle to get McCormick back to the ground. Still, McCormick continued to resist and struggle, and the officers were unable to subdue McCormick.

Police officers from Wilton Manors then arrived on the scene and used a stun gun against McCormick. Only then were the officers able to place handcuffs on McCormick. McCormick was taken into custody and charged with aggravated battery on a law enforcement officer, resisting arrest with violence, and battery.

In November 1999, McCormick brought suit against Officer Welker and the City.[10] McCormick claimed that Welker was liable under 42 U.S.C. § 1983 for

---

[10]Chief of Police Michael Brasfield was also named as a defendant, but the claims against him were dismissed and are no issue in this appeal.

10

violating McCormick's constitutional rights under the Fourth and Fourteenth Amendments[11] for unlawful arrest and excessive force. McCormick also alleged that Welker was liable for common law assault and battery. Against the City, McCormick claimed that the supervisory customs or policies of the City violated 42 U.S.C. § 1983 by permitting Officer Welker's constitutional violations; that the City was vicariously liable for the negligence of Officer Welker; and that the City was liable for excessive force under state law for its institutionalized practices.

Officer Welker and the City filed motions for summary judgment. The district court concluded that no dispute of "material" facts existed and that Officer Welker violated no constitutional right of McCormick in executing the arrest or in using force to effect that arrest.[12] Because the district court determined that Officer Welker's use of force was reasonable and complied with constitutional requirements, the district court also disposed of all the remaining claims against Officer Welker and the City.

## DISCUSSION

---

[11] McCormick also obliquely references an indecipherable Fifth Amendment claim which we cannot address because we do not understand it.

[12] The district court also concluded -- in the alternative -- that Officer Welker was entitled to qualified immunity because McCormick offered no evidence that Officer Welker's conduct violated clearly established constitutional law.

11

McCormick argues on appeal that the district court erred by granting summary judgment to Officer Welker and the City on the unlawful arrest and excessive force claims brought under 42 U.S.C. § 1983.[13] We review the district court's grant of summary judgment <u>de novo</u>, applying the same legal standards as the district court. <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1023 (11th Cir. 2000). Summary judgment is appropriate if the evidence establishes "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant, here McCormick.

---

[13] About the state-law claims, McCormick mainly contends that the district court erred by dismissing those claims with prejudice, denying him the opportunity to reassert the claims in state court. McCormick argues in the alternative that the negligence claim should survive because it may later be proved that the shooting was an accident. McCormick offered (and cites to) no evidence supporting an accidental theory of the shooting. Nor does McCormick reference law that requires the district court to dismiss the state-law claims without prejudice. The arguments are without merit.

McCormick's arguments that the district court erred by granting summary judgment to the City are also without merit. Because we conclude that Officer Welker's arrest and use of force were constitutionally permissible, there can be no policy or custom of the City that "officially sanctioned or ordered" a constitutional violation. <u>See</u> <u>Brown v. City of Clewiston</u>, 848 F.2d 1534, 1538 (11th Cir. 1988).

McCormick also complains in very general terms that the voluminous discovery was unlawfully curtailed by the district court. McCormick appeals no specific discovery ruling of the district court, and the argument is without merit.

McCormick chiefly contends that the district court erred by discounting his version of events and relying only on the defendants' telling of the facts. Only disputes of material fact are important at summary judgment.

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

Chapman, 229 F.3d at 1023 (internal quotes and citation omitted). Any alleged dispute of fact propounded by McCormick must be material to the lawfulness of the arrest or to the reasonableness of the force used by Officer Welker and supported by the record.

I.    Unlawful Arrest Claim

Probable cause to arrest under federal law exists when an arrest is "objectively reasonable based on the totality of the circumstances." Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002). "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe,

under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Id. (internal quotation marks and citations omitted)(emphasis added).

McCormick argues that Officer Welker had no objectively reasonable basis on which to effect an arrest. According to McCormick, Officer Welker personally witnessed no crime, interviewed no material witnesses at the crime scene, and conducted no interview with the victim or the alleged perpetrator before attacking McCormick. McCormick claims that the acts of Officer Welker were objectively unreasonable based on the marginal information available to the police officer. We disagree.

By the time Officer Welker arrived at the scene, he had received a radio dispatch call that there was a disturbance at the Laundry and then another radio call that upgraded the situation to an assault on a female victim. The assault was so severe that the victim required emergency medical attention. After arriving at the Laundry, Officer Welker saw a woman bleeding profusely. He spoke to her. The bleeding woman (Capuano) conveyed to Officer Welker that she had been assaulted and that her assailant was inside the Laundry. Hosein told Officer Welker that Capuano's assailant was inside the Laundry wearing a green shirt. When Officer Welker entered the Laundry, he questioned the people there; the two

14

men standing next to McCormick -- who was wearing a green shirt -- indicated that he was the assailant.

Officer Welker testified that -- judging from the profusely bleeding wound to Capuano's head -- an aggravated battery (a felony) had been committed. When Officer Welker entered the Laundry and saw McCormick armed with a stick, the officer had still further grounds to believe that a felonious, aggravated battery had been committed against Capuano. Officer Welker had trustworthy information that McCormick committed a violent felony against Capuano. And an objectively reasonable officer with the information available to Officer Welker could have believed that the facts established probable cause to arrest McCormick for the felony of aggravated battery. The district court correctly determined probable cause existed upon which to base an arrest, negating McCormick's claim of unlawful arrest.

II.    Excessive Force Claim

We begin our review of the excessive force claim by first determining whether the facts -- taken in the light most favorable to McCormick -- establish that Officer Welker violated McCormick's constitutional rights. "The Fourth

15

Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Lee, 284 F.3d at 1197 (citing Graham v. Connor, 109 S.Ct. 1865, 1871 (1989)). The question is whether Officer Welker behaved reasonably in the light of the circumstances before him. Vinyard v. Wilson, 311 F.3d 1340, 1347 (11th Cir. 2002).

We have said that "Graham dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." Lee, 284 F.3d at 1198. "'Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" Id. at 1197 (quoting Graham, 109 S.Ct. at 1871-72). "Use of force must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Vinyard, 311 F.3d at 1347 (internal quotation marks and citations omitted).

Two distinct applications of force happened during the arrest of McCormick: the pepper-spraying of McCormick and the shooting of McCormick.

16

## A.    Pepper-Spraying

In his affidavit submitted in opposition to the motions for summary judgment, McCormick claims that he had his back to the door when Officer Welker entered the Laundry to find Capuano's assailant.  McCormick says that he was unaware that a police officer was in the Laundry and that he made no verbal or visual contact with Officer Welker before receiving a burst of pepper spray to the face.  McCormick contends that he was pepper-sprayed when he turned to face an unknown person who was shouting, "Hey, hey, hey."  According to McCormick's affidavit opposing summary judgment, he would have submitted to Officer Welker had he been asked to do so.[14]

Assuming -- as we must at summary judgment -- McCormick's version of the events leading to the first application of pepper spray, McCormick has stated no constitutional violation.  When Officer Welker first confronted McCormick inside the Laundry, he already had seen Capuano's bleeding head wound and had probable cause to believe that McCormick had committed a violent felony.  Upon

---

[14]    We have repeatedly said that "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Lee, 284 F.3d at 1190 (quoting Priester v. City of Riviera Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000)).  In the sworn statement that McCormick gave to the police three days after the shooting, McCormick admits that he was repeatedly told to drop the stick before he was pepper-sprayed in the face, but that he refused to comply with that order.  Still, we today accept McCormick's affidavit.

17

seeing McCormick armed with the stick inside the Laundry, Officer Welker -- who responded alone to this scene of violence -- could have reasonably determined that McCormick still posed a threat of further violence. Officer Welker's use of a nonlethal weapon that would impose no lasting injury on McCormick was proportional to the threat posed by McCormick. Vinyard, 311 F.3d at 1348 ("[P]epper spray is a very reasonable alternative to escalating a physical struggle with an arrestee.").

McCormick argues that the Constitution plainly prohibited an application of pepper spray to a suspect of a violent felony without first giving the suspect a warning and an opportunity to submit. We read no such requirement into the Constitution. We have discovered -- and McCormick has argued -- no constitutional requirement for Officer Welker to give advance warning to McCormick that pepper spray would be used if McCormick did not immediately submit to Officer Welker's authority.[15] The constitutional requirement that the use

---

[15] We have discovered only one case in our Circuit involving a claim of excessive force based on the use of pepper spray: Vinyard v. Wilson, 311 F.3d 1340 (11th Cir. 2002). That case decided the constitutionality of using pepper spray on a handcuffed arrestee who posed no threat of harm to the police officer or to the public. Id. at 1349. Vinyard is not like this case. We have noticed only two additional cases in our Circuit involving the use of pepper spray in the course of an arrest. Neither case involved a claim that the use of pepper spray constituted excessive force. See Vinyard, 311 F.3d at 1348 n.10 (citing Pace v. Capobianco, 283 F.3d 1275 (11th Cir. 2002); Jones v. Cannon, 174 F.3d 1271 (11th Cir. 1999)).

of force be reasonable includes no requirement to warn a violent felon -- in circumstances like these -- that the use of pepper spray is forthcoming.

Pepper spray is an especially noninvasive weapon and may be one very safe and effective method of handling a violent suspect who may cause further harm to himself or others. Shock and surprise may be proper and useful tools in avoiding unnecessary injury to everyone involved when dealing with potentially violent suspects. Given that pepper spray ordinarily causes only temporary discomfort, it may be reasonably employed against potentially violent suspects, especially those suspects who have already assaulted another person and remain armed.

Officer Welker had probable cause to believe that McCormick had committed a violent felony when he saw the bleeding Capuano and good reason to believe McCormick still posed a threat of violence when he saw McCormick armed with the stick. Even assuming McCormick's version of events, Officer Welker's surprise use of pepper spray to subdue McCormick was proportionate to the potential threat and reasonable under the circumstances.[16]

---

[16] In the alternative, McCormick has not carried the burden of demonstrating that the law was clearly established that the surprise use of pepper spray on a violent felony suspect violated the Constitution. Officer Welker would still have the benefit of qualified immunity at summary judgment.

19

B.    Shooting

No disputes of material fact exist about the events immediately proceeding the shooting of McCormick. Officer Welker testified that McCormick was nonreactive to the pepper spray and ignored commands to drop his weapon. Although McCormick claims that he was only rushing outside and towards Officer Welker in an effort to regain his breathing after the pepper-spraying, McCormick admits he held on to the stick. McCormick claims in the affidavit that he heard others shouting at him but could understand nothing they were saying. McCormick's subjective perceptions have little bearing on how a reasonable officer in Officer Welker's position would have viewed McCormick's behavior. An objectively reasonable officer would have perceived McCormick as a threat.

Officer Welker claims that McCormick then was advancing towards Officer Welker, pumping or swinging the stick above McCormick's head. Officer Welker drew his gun in response to this threat. McCormick admitted in the statement given to the police three days after the shooting that he still had the stick in his hand when Officer Welker drew his gun, but he was not afraid that Officer Welker would shoot him. This admission is not contradicted by McCormick's affidavit of five years later. McCormick only says in the affidavit that he "lifted [his] hands in

20

submission" out of fear that his assailant (the officer) would attack again. McCormick does not deny having the stick in his hand when his hands were allegedly raised in submission.

When Officer Welker tripped over the parking stone, he became quite vulnerable to attack by McCormick. McCormick charged Officer Welker as he was falling. Officer Welker was afraid that McCormick might have access to his firearm if McCormick was successful with his attack. Fearing that McCormick was a threat to the officer and others, Officer Welker shot McCormick.

The Supreme Court has said that "if the suspect threatens the officer with a weapon or there is probable cause to believe that [the suspect] has committed a crime involving the infliction or threatened infliction of serious physical harm," then it is constitutionally permissible to use deadly force to prevent escape of the suspect. Tennessee v. Garner, 105 S.Ct. 1694, 1701 (1985). Because the Constitution permits the use of deadly force to prevent a violent suspect from escaping, the Constitution must also permit the use of deadly force against a suspect who poses not merely an escape risk (because he is not yet in police control), but also an imminent threat of danger to a police officer or others.

Officer Welker had probable cause to believe that McCormick earlier had committed a violent felony, could reasonably perceive that McCormick posed an

imminent threat of violence to the officer and other bystanders, and noted that McCormick continued to ignore repeated commands to drop his weapon. Officer Welker's decision to shoot McCormick under these circumstances was objectively reasonable. See Graham, 109 S.Ct. at 1872 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."). Officer Welker responded within the confines of McCormick's constitutional rights. The district court correctly granted summary judgment to Officer Welker on the claim about the shooting.

CONCLUSION

Shortly after arriving at the Laundry, Officer Welker had sufficient and trustworthy information upon which to base probable cause to arrest McCormick for a violent felony. In addition, Officer Welker's uses of force on McCormick were reasonable under the circumstances, considering that McCormick had apparently just committed a crime of violence and -- from an objectively reasonable viewpoint -- refused to submit to police authority, and posed a

22

continual threat of further violence.  The district court correctly granted summary judgment in favor of Officer Welker and the City.

AFFIRMED.