[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-15218
_____

D.C. Docket No. 3:11-cv-00081-TCB


KEVIN G. RODDY,
a.k.a. Kevin Grayson Roddy,

Plaintiff - Appellant,


versus


CITY OF VILLA RICA, GEORGIA,

Defendant - Appellee.


_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(October 4, 2013)

Before PRYOR and COX, Circuit Judges, and WALTER,[*] District Judge.

PER CURIAM:

This appeal requires that we determine, first, whether an employee who never requested a transfer to another position as a reasonable accommodation from his employer can maintain a claim of failure to provide that transfer as a reasonable accommodation under the Americans with Disabilities Act; second, whether additional leave time is a reasonable accommodation when an employee cannot establish that he will be able to perform his job in the present or immediate future; third, whether an employee can establish a claim of either disability discrimination or retaliation when his employer stated that it terminated him because of his inability to perform his job and the record confirms that he could not perform his job; and, fourth, whether an employee can predicate a claim under Georgia law for intentional infliction of emotional distress on his termination from his job.  Kevin Roddy was a patrol officer employed by the police department of the City of Villa Rica, Georgia.  After suffering an injury while off duty, Roddy took a leave of absence for back surgery in April 2010.  During his recovery, he gave the department a note from his doctor stating that he could return to work in January 2011.  Roddy never requested that any decision maker with the City provide him with a transfer to a new position, but gave the City a note that asked for additional

---

[*]Honorable Donald E. Walter, United States District Judge for the Western District of Louisiana, sitting by designation.

leave time.  After Roddy exhausted his entitlement to leave under the Family Medical Leave Act, the City terminated him because of his physical inability to return to work.  Roddy filed a complaint against the City for disability discrimination, retaliation, intentional infliction of emotional distress, and negligent supervision.  The district court entered a summary judgment in favor of the City.  We affirm.

## I. BACKGROUND

Kevin Roddy was a patrol officer employed by the police department of the City of Villa Rica, Georgia.  While off duty, Roddy fell at a restaurant and injured his back.  After his injury, Roddy's doctor, Ali Mortazavi, told him that he was a candidate for back surgery, but Dr. Mortazavi would try other measures to avoid the need for surgery.  A few months later, Dr. Mortazavi told Roddy that his back was not improving and he could cause more serious injury to his back if he were involved in a physical altercation.

In April 2010, Roddy gave the City a note from Dr. Mortazavi that stated that Roddy would need to be absent from work from April 2, 2010, until July 1, 2010, for back surgery.  Roddy received twelve weeks of leave under the Family Medical Leave Act.  In an email Roddy sent to several City employees that May, he wrote that he was "not sure what the future holds for me in my law enforcement

3

career." Roddy stated that, although Dr. Mortazavi told him there was "a possibility of returning," that possibility was "slim."

In June 2010, Dr. Mortazavi gave Roddy a certificate of work status that listed January 3, 2011, as the date Roddy could "return to full and normal work status with no restrictions." Roddy gave the certificate to Mary Chaffin, the human resources officer for the City. According to Dr. Mortazavi, although it was possible that Roddy could return to work several weeks or months before January 3, 2011, that possibility was premised on Roddy undergoing a second back surgery. Roddy told Chaffin that he may need a second surgery to help "stabilize" his back. Roddy also told Chaffin that he could not sit or stand for long periods of time. Roddy also spoke with Michael Mansour, Chief of the police department. Roddy gave Chief Mansour the certificate, but he made no request of the Chief.

By the end of June 2010, Roddy had exhausted all of his leave time under the Leave Act. Chief Mansour believed that, based on all the circumstances, including the note from Dr. Mortazavi, Roddy could not return to work for at least four or five more months. Because the department has a limited number of "budgeted, sworn officer positions," Chief Mansour could not hire any additional officers as long as he held a position vacant for Roddy. Around July 22, 2010, Chaffin sent Roddy a letter that notified him of his termination. The letter stated

4

that the City terminated Roddy because he was physically unable to work, but it would consider him for reemployment if his condition improved.

On July 28, 2010, Roddy filed a charge against the City with the Equal Employment Opportunity Commission. Roddy later filed in the district court a complaint against the City for discrimination and retaliation under the Americans with Disabilities Act and claims for intentional infliction of emotional distress and negligent supervision under Georgia law. Roddy later filed an amended complaint alleging the same claims.

Roddy testified by deposition that, before April 2010, he never submitted documentation that he was unable to perform his duties as a patrol officer or that he needed an accommodation. Roddy testified that, on the same day that Dr. Mortazavi gave him the certificate of work status, Roddy asked Dr. Mortazavi if he could return back to "light-duty" work that same day. Although Dr. Mortazavi told Roddy that he preferred that Roddy not return to work, Roddy could return "if that's what [he] need[ed] to do." Roddy insisted he wanted to return to work "to make money for [his] family." Roddy described bringing his certificate of work status to Chaffin. He explained that, after he gave his certificate to Chaffin, she asked if he could perform light-duty assignments. He testified that he expressed willingness to do light-duty work. But he also told Chaffin that he could not sit or stand for long periods of time. He also informed Chaffin that Dr. Mortazavi

5

wanted him to undergo a second surgery.  Roddy testified that, on that same day, he met with Chief Mansour.  Although Roddy told Chief Mansour that his return date of January 3, 2011, was not "set in stone," Roddy testified that he made no request of Chief Mansour during that meeting.

After the City filed a motion for a summary judgment, Roddy filed an affidavit that contradicted his earlier deposition testimony.  In that affidavit, Roddy stated that he "never told Ms. Chaffin in th[e] conversation or at any other time that [he] couldn't sit or stand for any length of time or for more than just a few minutes at a time."  Roddy stated that, after he gave him his certificate, Roddy told Chief Mansour that he might be able to return to light-duty work before January 3, 2011.  Roddy also stated that he told Chief Mansour that Dr. Mortazavi "was alright with me working as an Investigator from a medical standpoint" and that, if there was no investigator position available, he would "like to be given some additional leave."

Chaffin testified by deposition that she asked Roddy if he could perform light-duty work, and he responded that he could not.  She testified that she did not ask Roddy whether the return date on the certificate was a "hard-and-fast date," but instead "believe[d] what the doctor[] wrote down."  Chaffin testified that the last information she received from Roddy about his health was the June 11 certificate from Dr. Mortazavi that stated that Roddy could not return to work until January 3,

6

2011, and that she has never received a note from Dr. Mortazavi that released Roddy to return to work. She also testified that, after Roddy gave her the certificate, she called Chief Mansour to let him know that she had received the certificate. After the call to Chief Mansour, she had no further discussions about Roddy's employment status. In her declaration, Chaffin provided more details about her call to Chief Mansour and stated that she told Chief Mansour that Roddy had told her that he could not perform light-duty work.

Chief Mansour testified by deposition that, after Roddy gave him the certificate, Roddy did not tell him that Dr. Mortazavi did not want Roddy to continue to serve as a patrol officer, nor that Dr. Mortazavi told Roddy that he was not physically capable of working as a patrol officer, nor that Roddy would continue to work as a patrol officer if it was necessary. Chief Mansour testified that Roddy did not tell him that the return date on the certificate "was not a date that was set in stone." Chief Mansour testified that Roddy told him that he wanted to come back to work, but did not know if he would be able. Chief Mansour testified that Roddy did not tell him that Dr. Mortazavi thought Roddy should be transferred to the position of investigator after his surgery, and Chief Mansour and Roddy never discussed any transfer or additional leave time. In an affidavit, Chief Mansour explained that, after he spoke to Chaffin about Roddy's certificate, he spoke to Larry Wood, the city manager, about Roddy's return date. Chief Mansour

7

told Wood that, because he was already short of manpower with Roddy's absence, he could not wait until January 2011 without hiring a new officer. Because the department had a limited number of positions for officers, Chief Mansour could hire a new officer only if he terminated Roddy.

Dr. Mortazavi testified by deposition that he never told Roddy he could not work as a patrol officer, but did advise against it. He testified that it was possible Roddy could return to work as a patrol officer before January 3, 2011, if Roddy underwent a second surgery. He testified that, when he scheduled Roddy's surgery, he told Roddy there was a chance he could return to work as a patrol officer, but he "just couldn't guarantee it." When he was asked in a questionnaire by an attorney whether Roddy could "return to his job as a law enforcement officer" as of August 25, 2010, Dr. Mortazavi wrote "No" and underlined his answer. Dr. Mortazavi testified that, when he wrote "No," he was referring to Roddy's ability to return to work at that time. Dr. Mortazavi testified that, as of November 29, 2011, he had released Roddy to work as a detective, but not as a patrol officer without restrictions.

The City filed a motion for a summary judgment against Roddy's complaint. A magistrate judge recommended that the district court grant the motion. The magistrate judge recommended that the district court dismiss all alleged violations that occurred before February 2010 as untimely because Roddy filed his complaint

8

with the Equal Employment Opportunity Commission on July 28, 2010, and the Disabilities Act requires a plaintiff to file a complaint with the Commission within 180 days of the occurrence of an unlawful event.  See 42 U.S.C. § 2000e-5(e)(1). The magistrate judge recommended that the district court grant summary judgment against Roddy's claim of failure to provide a reasonable accommodation under the Disabilities Act because the extended leave requested by Roddy was not reasonable and there were no investigator positions available when Roddy allegedly requested an investigator position.  The magistrate judge recommended that the district court grant summary judgment against Roddy's claim of discriminatory discharge because Roddy failed to establish that he suffered unlawful disability discrimination or that the reason for his termination proffered by the City, his inability to work, was pretextual.  The magistrate judge recommended that the district court grant summary judgment against Roddy's claim of retaliation for the same reason.  The magistrate judge recommended that the district court grant summary judgment against Roddy's claim of intentional infliction of emotional distress because employment-related activities alone cannot serve as the predicate for a claim of intentional infliction of emotional distress. The magistrate judge recommended that the district court grant summary judgment against Roddy's claim of negligent supervision because, under Georgia law, a claim of negligent supervision cannot be predicated on a violation of the

9

Disabilities Act. The district court adopted these recommendations and granted summary judgment in favor of the City.

## II. STANDARD OF REVIEW

We review de novo a summary judgment. Schoenfield v. Babbit, 168 F.3d 1257, 1264 (11th Cir. 1999).

## III. DISCUSSION

We divide our discussion in three parts. First, we explain that the City was entitled to a summary judgment against Roddy's claim of failure to provide a reasonable accommodation because he never requested a transfer to the position of investigator as an accommodation and the extended leave he requested was not a reasonable accommodation. Second, we explain that the City was entitled to a summary judgment against Roddy's claims for disability discrimination and retaliation because the proffered reason for his termination, Roddy's inability to perform his duties as a patrol officer, was undisputed. Third, we explain why the City was entitled to a summary judgment against Roddy's claim of intentional infliction of emotional distress because, under Georgia law, that claim cannot be predicated on an employment decision alone. Because claims for negligent supervision cannot be established without another, predicate offense, see MARTA v. Mosley, 634 S.E.2d 466, 469 (Ga. Ct. App. 2006), and all of Roddy's other claims have been dismissed, we need not address whether, under Georgia law, a

10

claim of negligent supervision can be predicated on a violation of the Disabilities Act.

*A. Because Roddy Never Requested a Transfer as an Accommodation and Failed To Establish That He Could Return to Work in the Present or Immediate Future, the City Was Entitled to a Summary Judgment Against Roddy's Claim of Failure To Provide a Reasonable Accommodation.*

Roddy argues that there is a genuine issue of material fact as to whether either a transfer to an investigator position or an extended leave of absence were reasonable accommodations.  Under the Disabilities Act, an employer cannot discriminate "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  "[T]o establish a prima facie case of discrimination under the [Act], [the plaintiff] must demonstrate that she (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of her disability."  Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000).  A "qualified individual" is someone with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  "[A] plaintiff must show either that he can perform the essential functions of his job without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation."  D'Angelo v. ConAgra

11

Foods, 422 F.3d 1220, 1229 (11th Cir. 2005) (internal quotation marks omitted).

"An employer unlawfully discriminates against a qualified individual with a

disability when the employer fails to provide 'reasonable accommodations' for the

disability—unless doing so would impose undue hardship on the employer."

Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001) (quoting

Davis v. Fla. Power & Flight Co., 205 F.3d 1301, 1305 (11th Cir. 2000)) (citing 42

U.S.C. § 12112(b)(5)(A)).  But "the duty to provide a reasonable accommodation

is not triggered unless a specific demand for an accommodation has been made."

Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir.

1999).

### 1. Roddy Never Requested a Transfer to an Investigator Position as an Accommodation for His Disability.

We need not address Roddy's claim that the City failed to provide him a

reasonable accommodation by transferring him to an investigator position because

Roddy did not establish that he made a specific demand for that accommodation,

and the failure to make that specific demand is fatal to his claim.  See Welding

Servs. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007) ("This court may affirm

[the grant of a motion for a summary judgment] on any ground supported by the

record.").  After his surgery, Roddy gave his certificate of work status to both

Chaffin and Chief Mansour.  Roddy did not request a transfer to an investigator

position from Chaffin when he gave her the certificate, and he testified that he

12

made no requests of Chief Mansour during their meeting.  Although Roddy stated in his later-filed affidavit that he requested either additional leave time or a transfer to an investigator position from Chief Mansour, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact [for summary judgment], that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'" McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) (emphasis omitted).  Because Roddy never requested a transfer from either Chief Mansour or Chaffin as an accommodation for his disability, Roddy's claim of failure to accommodate fails as a matter of law. Gaston, 167 F.3d at 1363–64.

2. An Extended Leave Would Not Have Been a Reasonable Accommodation.

Roddy argues that the district court erred when it found that the extended leave Roddy requested was an unreasonable accommodation.  "[A]n employer d[oes] not violate the [Disabilities Act] by 'refusing to grant [an employee] a period of time in which to cure his disabilities' where the employee 'sets no temporal limit on the advocated grace period, urging only that he deserves sufficient time to ameliorate his conditions.'" Duckett v. Dunlop Tire Corp., 120 F.3d 1222, 1226 (11th Cir. 1997) (citing  Myers v. Hose, 50 F.3d 278, 282 (4th Cir. 1995)).  Although a leave of absence may in some circumstances be a

13

reasonable accommodation, "an accommodation is unreasonable if it does not allow someone to perform his or her job duties in the present or in the immediate future." Wood v. Green, 323 F.3d 1309, 1314 (11th Cir. 2003). "The [Disabilities Act] covers people who can perform the essential functions of their jobs presently or in the immediate future." Id.

The district court did not err. Roddy's request for an extended leave of absence would not have allowed him to perform his job in the present or immediate future. In his email to City officials, Roddy stated that, although Dr. Mortazavi told him there was "a possibility of returning," that possibility was "slim." On the day Roddy gave Chaffin his certificate of work status, he told her that he may need a second surgery to help "stabilize" his back, and that he could not sit or stand for long periods of time. Dr. Mortazavi testified that he did not clear Roddy to return to work as of August 25, 2010, and had not cleared Roddy to work as a patrol officer without restrictions as of November 21, 2011. Mortazavi also testified that the date of January 3, 2011, was "purely a guess," and that he "frequently adjust[s] these dates as we go along during the healing process" because he "really ha[s] no way to know when a person exactly heals or what kind of complication they have after surgery."

14

*B. Because Roddy Failed To Establish That the Proffered Reason for His Termination Was Pretextual, the City Was Entitled to a Summary Judgment on the Claims for Discriminatory Discharge and Retaliation.*

Roddy argues that there is a genuine issue of material fact as to whether the City terminated him because of his disability and that the reason proffered by the City was pretextual. "To establish a prima facie case of discrimination under the [Disabilities Act], a plaintiff must show: (1) she is disabled; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of her disability." Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000). "To establish a prima facie case of retaliation, a plaintiff must show: (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action." Stewart v. Happy Herman's Cheshire Bridge, 117 F.3d 1278, 1287 (11th Cir. 1997). When a plaintiff establishes a prima facie claim of disability discrimination or retaliation, the burden of production shifts to the defendant to provide "legitimate, nondiscriminatory reasons" for the purported discrimination. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1331 (11th Cir. 1998); Stewart, 117 F.3d at 1287. The plaintiff must then introduce evidence "to allow a reasonable fact finder to conclude that the proffered reasons were not actually the motivation." Standard, 161 F.3d at 1332; see also Stewart, 117 F.3d at 1287. The plaintiff can rebut the proffered reasons "(1) by showing that the legitimate nondiscriminatory reasons

15

should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons." See Standard, 161 F.3d at 1332.

The City stated that the reason Roddy was terminated was his physical inability to return to work, and Roddy failed to establish that this reason is pretextual. In the letter terminating Roddy, the City stated that Roddy was being terminated "[b]ased on [his] inability to perform the tasks of [his] position." The City explained that it terminated Roddy because he "was unable to return to work in any capacity, and his doctor indicated that he would not be able to return [to] work for at least six months." Although Roddy argues that there is "a major factual dispute in the evidence" as to whether "Chief Mansour and Mary Chaffin believed/understood that [Roddy] was unable to continue working in any capacity," the record establishes no such dispute. Chief Mansour testified that Roddy told him that, although he wanted to return to work, he did not know if he would be able to do so. Chaffin testified that she never received a note from Dr. Mortazavi that released Roddy to return to work. Roddy's email to City officials stated that the possibility of returning to law enforcement was "slim." Dr. Mortazavi testified that, as of August 25, 2010, he had not cleared Roddy to return to work. And Roddy testified that he told Chaffin that he could not sit or stand for long periods of time. Although Roddy stated in his later-filed affidavit that he

16

never told Chaffin "that I couldn't sit or stand for any length of time or for more than just a few minutes at a time," Roddy cannot create a genuine issue of material fact by filing an affidavit that contradicts his earlier deposition testimony. See McCormick, 333 F.3d at 1240 n.7.

Roddy argues that Chaffin had no basis to believe that Roddy was unable to return to work when he was terminated, but the record establishes otherwise. Chaffin testified that she understood that Roddy was unable to return to work because he was on short-term disability and was "'probably' going onto long-term disability." Chaffin also testified that the last information she received from Roddy about his health was the June 11 certificate from Dr. Mortazavi, which stated that Roddy could not return to work until January 3, 2011, and that she has never received a note from Dr. Mortazavi that released Roddy to return to work. Although Roddy argues that he told Chief Mansour and Chaffin that his return to work on January 3, 2011, was only an estimate, that fact does not establish that Roddy could return to work at the end of his leave period. Because Roddy failed to establish that the legitimate reason proffered by the City for his termination was pretextual, the district court correctly granted a summary judgment against Roddy's claims of disability discrimination and retaliation.

17

*C. Because a Claim of Intentional Infliction of Emotional Distress Cannot Be Predicated on an Employment Decision Alone, the City Was Entitled to a Summary Judgment Against That Claim.*

Roddy argues that Georgia law allows for claims for intentional infliction of emotional distress based on discriminatory, retaliatory, or harassing conduct. In Georgia, to prevail on a claim of intentional infliction of emotional distress, a plaintiff must establish that "(1) the conduct giving rise to the claim was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe." Steed v. Fed. Nat'l Mortg. Corp., 689 S.E.2d 843, 851 (Ga. Ct. App. 2009). "The defendant's conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim of intentional infliction of emotional distress is a question of law." Frank v. Fleet Fin., 518 S.E.2d 717, 720 (Ga. Ct. App. 1999) (internal quotation marks and citation omitted). "Georgia courts have held that an employer's termination of an employee—however stressful to the employee—generally is not extreme and outrageous conduct." Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1229 (11th Cir. 1993) (citing ITT Rayonier v. McLaney, 420 S.E.2d 610, 612 (Ga. Ct. App. 1992)).

18

The record does not establish that the City subjected Roddy to any extreme and outrageous conduct.  Although Roddy was terminated, he "was not subjected to any abuse or otherwise treated with disrespect."  Id.  His termination alone does not rise to the level of "extreme and outrageous conduct" upon which a claim of intentional infliction of emotional distress can be maintained.

Additionally, the record does not establish that any emotional distress suffered by Roddy was severe.  Although "the frustration associated with [losing] one's job . . . is understandable," that frustration alone is not "sever[e]."  Jones v. Fayette Family Dental Care, Inc., 718 S.E.2d 88, 91 (Ga. Ct. App. 2011).  When describing his emotional distress, Roddy explained that he "got in a depression mode that you wouldn't never believe."  He described the food drive his church hosted for him and his family as "downgrading."  He also testified that he had trouble sleeping.  The kind of distress described by Roddy, although unfortunate, is akin to the distress ordinarily associated with the loss of a job, and Georgia courts have held that that kind of distress is not "severe."  See id.

## IV. CONCLUSION

We **AFFIRM** the summary judgment in favor of the City.

19