[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-11532
_____

D.C. Docket No: 9:10-cv-80038-KAM

PAUL GAUGUIN CRUISES, INC.,
a Delaware Corporation,
a.k.a. PGC, Inc.,

Plaintiff - Appellant,

versus

ECONTACT, INC.,
a Florida Corporation,
STEVE HABER,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 12, 2014)

Before MARCUS, Circuit Judge, and PROCTOR[*] and EVANS,[**] District Judges.

_____

[*] The Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

[**] The Honorable Orinda D. Evans, United States Senior District Judge for the Northern District of Georgia, sitting by designation.

PER CURIAM:

The question presented in this case is whether the District Court erred by granting summary judgment on a fraud claim. After careful review and with the benefit of oral argument, we conclude that summary judgment should not have been granted in this case and that the case must be remanded to the district court for trial on the fraud claim.

## I. BACKGROUND

Paul Gauguin Cruises, Inc., ("PGC") filed this civil action in the district court against eContact, Inc. and Steve Haber.  Although the complaint asserted three claims for relief, the only one at issue in this appeal[1] is a claim of fraud in the inducement.

The parties filed cross-motions for summary judgment. The district court granted in part and denied in part eContact's and Haber's motion for summary judgment and denied PGC's motion for summary judgment. In particular, the court granted Haber's summary judgment on the fraud in the inducement claim.

## II. SUMMARY OF RELEVANT FACTS

---

[1] This case has been the subject of a prior appeal and was previously remanded back to the district court.  However, in this current appeal, our review is limited to the district court's grant of summary judgment on the fraud in the inducement claim.

eContact provides business development and marketing services primarily in the travel industry. Haber is the President and co-owner of eContact.  Haber's wife, Betsy Flynn, is a director and co-owner of eContact.  Haber is responsible for sales and client relationships, while Flynn handles operations and administration.  At the time of the events relevant to this case, the owner and president of PGC was Harry "Hank" Lewis.  PGC operated a single vessel, The Paul Gauguin, a passenger ship that cruises Tahiti, French Polynesia, and the South Pacific Ocean.

Lewis and Haber began discussing the terms of an agreement at some point between December 2008 and March 2009.  Lewis testified that he told Haber that it was his intention to sell or charter the ship, but if he could not do so, he would need eContact's services to help book 2010 cruises aboard the ship.  According to Lewis, Haber understood that he was in the process of selling or chartering The Paul Ganguin.  Haber acknowledges that he knew Lewis wanted to sell the ship, but claims Lewis told him a sale was not imminent.

On June 10, 2009, PGC and eContact entered into a contract wherein eContact was to provide marketing services, inside sales, and a reservation team to PGC.  Lewis negotiated the terms of the contract and personally signed it on behalf of PGC.  The terms of the agreement required PGC to advance to eContact three installments of $100,000.00 against commissions.  Those payments were to start on June 1, 2009 and end on August 1, 2009. The contract further provided that

3

"[a]dvance will be netted from eContact commissions, and eContact will continue until advance is net zero or return a check back to PGC for any advance amounts which have not netted to zero (e.g., if the arrangement is terminated by either party)." The contract required sixty days notice of termination, and called for a review of the program every three months to determine continuation. eContact drafted and negotiated the contract, and had an attorney review the contract before it was signed.

Joseph Kurosz was one of PGC's main contacts with eContact and Haber. Kurosz gave affidavit testimony that Haber recommended to him in an e-mail that PGC draft contract language "that assures that unearned advance money is returned to PGC if [the] agreement is terminated and that 60 days' notice is required for termination." Haber disputes that he recommended that language or anything contrary to the terms of the signed contract.[2] According to Lewis, before signing the agreement, he and PGC relied on Haber's representation that all unearned commissions would be returned to PGC in the event that the contract was terminated. Lewis further testified he would not have entered into the agreement without that assurance.

PGC advanced a total of $200,000 in commission money under the June 10, 2009 agreement. eContact used the first two $100,000.00 installments to pay for a

_____

[2] Notwithstanding Haber's denial, the court's review of the contract's terms reveals that it is entirely consistent with the language of Haber's purported email.

variety of expenses associated with the project.  On July 22, 2009, before the third installment payment was due, PGC's counsel, Keith Nashawaty, contacted eContact to say that PGC intended to terminate the contract.  He advised eContact that PGC was in the process of selling substantially all of its assets to a third-party and that PGC would introduce eContact to the purchaser.  The following day, on July 23, 2009, PGC, via email, provided formal notice to eContact that it was terminating the contract in sixty days and advised that it would not be advancing the additional $100,000 due under the agreement.

In September 2009, PGC demanded return of the $200,000.  Haber responded that eContact would not be returning the commission money advanced, but would instead continue its work in order to earn against the commissions advanced by PGC.  PGC's counsel sent Haber an email stating that the agreement between the parties addressed a transition in ownership and the possibility of having to terminate the contract and return unearned commissions. Lewis also sent Haber a letter demanding the return of all unearned commissions.

On the date PGC provided its notice terminating the contract, eContact had not yet earned any commissions.  Nevertheless, instead of returning unearned commissions, eContact indicated through Haber that it expected to continue its efforts to sell cruise tickets and net the advance to zero.

5

PGC claims that Haber fraudulently induced it to enter into the contact by promising to return unearned commissions upon termination even though it was never his intent to return any commission money advanced.  If that claim were based solely upon the facts discussed above, it would not find sufficient Rule 56 support. However, PGC also points to the following deposition testimony of Haber and asserts that this testimony permits an inference that it was always Haber's intention to keep earning against the advance:

Q:    Okay.  So you never intended to give back any of the 200,000 advances?

…

A:    I never thought we would have to give the money back, no.

(S.D. Fla. Case No. 9:10-cv-80038-KAM, Doc. # 27-1 at p. 91).

Q:    Okay.  So, you now testified earlier that it was your understanding that you never expected to send any money back, that you were gonna net this to 0?

A:    Right

Q:    Okay.  Well, why would you agree to language in there that says that return a check to Paul Gaugin Cruises for any advance amounts which have not netted to 0?

A:    'Cause I thought we would be beyond that so we would be way beyond the two hundred,  I mean, even after two months we'd be getting into the territory we wouldn't owe them any money anyway, so it didn't worry me.

…

6

Q:    So when you signed this contract, is that correct, you never intended to return any of the advance commissions even if the contract was terminated.

A:    I always intended to earn the commissions … .

Q:    But what if you not [sic] earned the 200,000 in commissions, you had only earned 140, did you expect to have give [sic] back a check for 60, or never?

A:    No, you continue until you do. …

…

Q:    Its real simple, the two hundred grand, you never intended to give it back under any set of circumstances; is that correct? …

A:    But we say we continue until we do.

…

Q:    All right, after the 60 days expired what did you do to earn the commissions the [sic] 200,000?

A:    We were not allowed to continue and that was the problem. That's why we had a big disagreement because we were at an impasse.  They didn't want us to continue. They just wanted their money back …

…

Q:    Okay, you expect him to give you a hundred, but you don't expect to have to give him back any money ever?

…

A:    I expect to earn it back through our program  …

A:    We expected Mr. Lewis to get his money back through our activities, correct, that was our agreement.  Advance and we would

7

earn it back, and so we always expected to have Mr. Lewis made whole, or his company. …

(S.D. Fla. Case No. 9:10-cv-80038-KAM, Doc. # 27-1 at pp. 116 - 124).

Q:    If they had given you the other money as you demanded, you would have said that you were entitled to earn back all three hundred thousand because you never intended to write a check back to Paul Gaugin under any circumstances?

…

A:    No, not that we never intended to, but that wasn't what our understanding of the agreement was.  …

(S.D. Fla. Case No. 9:10-cv-80038-KAM, Doc. # 27-1 at p. 129).  In order to resolve the issues presented in this appeal, it is necessary for us to analyze this deposition testimony as well as the other portions of the Rule 56 record.

## III.  STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo, viewing the facts and drawing all reasonable inferences in the light most favorable to PGC, the nonmoving party.  Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d 334, 341-42 (11th Cir. 2012).

## IV.  DISCUSSION

We begin by looking to Florida law to define the proof requirements of PGC's fraud claim.  "A cause of action for fraud in the inducement contains four elements: (1) a false statement regarding a material fact; (2) the statement maker's knowledge that the representation is false; (3) intent that the representation induces

8

another's reliance; and (4) consequent injury to the party acting in reliance." PVC

Windoors, Inc. v. Babbitbay Beach Const., N.V., 598 F.3d 802, 808-09 (11th Cir.

2010) (quoting Thompkins v. Lil' Joe Records, Inc., 476 F.3d 1294, 1315 (11th

Cir. 2007) (internal quotations omitted).  Under Florida law,

> [a]s a general rule, fraud cannot be predicated on a mere promise not
> performed. However, under certain circumstances, a promise may be
> actionable as fraud where it can be shown that the promisor had a
> specific intent not to perform the promise at the time the promise was
> made, and the other elements of fraud are established.

PVC Windoors, Inc., 598 F.3d at 809 n.12 (quoting Alexander/Davis Props., Inc. v.

Graham, 397 So.2d 699, 706 (Fla. 4th Dist.Ct.App. 1981) (per curiam) (citations

omitted)).

The key question in this case relates to the interpretation and import of

Haber's deposition testimony.  After review, we conclude that because Haber's

testimony is subject to a number of interpretations, it raises issues that must be

resolved by a trier of fact.  In addition, viewing the evidence in the light most

favorable to PGC (the non-moving party), we note that there is substantial

evidence that indicates that, at the time of the negotiations, PGC was concerned

about entering into the contract because it was actively seeking to sell or charter

the ship.  Joseph Kurosz testified that Haber recommended to him that PGC draft

language for inclusion in the contract to "assure that unearned advance money is

returned to PGC if the agreement is terminated and 60 days' notice is required for

9

termination." (Emphasis added). There was also evidence in the record that Lewis and PGC relied on this representation that unearned advanced commissions would be "returned" if the contract was terminated. Haber disputes that he recommended such language and has testified that he always expected to earn the money back. Although a trier of fact could credit that assertion, a jury could just as well infer from his testimony that Haber never intended to "return" any money if the contract was terminated.

There is, therefore, evidence (albeit disputed evidence) in the Rule 56 record, from both Lewis and Kurosz, that before the contract was executed, Haber specifically promised PGC that, in the event the contract was terminated, any unearned commissions would be returned. There is also evidence in the record that PGC relied upon this representation. Finally, there is deposition testimony from Haber which could be interpreted to mean that he never intended to return any of the advance money. There is sufficient evidence in the record upon which a jury could rely upon to infer that, despite his promise to the contrary, Haber never intended to return any of the advance money.

The district court concluded that there was no fraudulent intent and that it was Haber's understanding that he would be able to earn the money back. The trial court noted that, "[e]ach time Haber [was] asked whether he intended to return the commission money to PGC, Haber explain[ed] that his intent was always to

10

earn the commission money back." The problem with this summary judgment conclusion is that it draws inferences in favor of Haber and ignores a competing reasonable inference that Haber always intended to keep the money (despite his promise to return it).

The district court's acceptance of Haber's explanation and the favorable determination that he lacked fraudulent intent necessarily involved a credibility determination. There is evidence from which a jury could reasonably conclude that when Haber made the misrepresentation that unearned advance money would be returned to PGC if the agreement was terminated, he never intended to return such money. The district court credited Haber's explanation that he simply misunderstood the contract terms. But that is emphatically a matter for the trier of fact to resolve, not for a court to decide on summary judgment. "'Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment.'" Delaware Valley Floral Group, Inc. v. Shaw Rose Nets, LLC, 597 F.3d 1374, 1381 (11th Cir. 2010) (quoting McCormick v. City of Fort Lauderdale, 333 F.3d 1234 (11th Cir. 2003)).

PGC presented substantial evidence to support each of the elements of its fraudulent inducement claim. Therefore, that claim must be presented to a jury so

11

that it may make appropriate determinations about the credibility of the witnesses, including Haber's explanation.[3]

## V.  CONCLUSION

We conclude that the district court erred in granting Haber summary judgment on PGC's fraudulent inducement claim.  PGC is entitled to have a jury resolve the disputed issues of fact that remain in this case.  Accordingly, the judgment is reversed and this case is remanded for further proceedings consistent with this opinion.

**REVERSED AND REMANDED**.

---

[3] This is particularly true here because there is a substantial question as to whether Haber's explanation makes sense as a matter of simple economics.  PGC terminated the contract and demanded repayment of its advance commission payments (totaling $200,000) because it was in the process of selling the ship.  Although Haber had not sold any tickets, he claims it was his intention to continue to book passengers and earn the advance commissions from PGC.  But at that point, it is at best unclear whether PGC could have still realized any financial benefit from those bookings.  In other words, would any work after the contract's termination actually inure to the benefit of the purchaser of the ship (as opposed to PGC)?  We note that the record indicates PGC had already volunteered to introduce eContact to the new owner.  Haber's explanation raises credibility issues which must be resolved by a trier of fact.

12